**PINK SUPPLY CORP., Plaintiff,**

**v.**

**HIEBERT, INC., Northern Design Products, Inc., Interior Design Products, Inc., Michael Ketcham, and John Brion, Defendants.**

**Civ. No. 4–84–77.**

United States District Court,
D. Minnesota,
Fourth Division.

May 1, 1985.

Bradley G. Clary, Marko J. Mrkonich, Cheryl L. Appledorn, Oppenheimer, Wolff, Foster, Shepard & Donnelly, St. Paul, Minn., for plaintiff.

Daniel R. Shulman, Margaret M. Shulman, Patricia A. Knipe, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., for defendants.

MacLAUGHLIN, District Judge.

This matter is before the Court on defendants' motion for summary judgment on plaintiff's federal antitrust claims. The Court will grant that motion. Defendant Hiebert, Inc. also seeks summary judgment on its counterclaim for goods sold and delivered. The Court will deny that motion.

## BACKGROUND

Plaintiff Pink Supply Corporation (Pink) is a distributor of office furniture in the Minneapolis, Minnesota area. Defendant Hiebert, Inc. (Hiebert) is a manufacturer of wood office furniture which has Carson, California as its principal place of business, and which transacts business in the Minneapolis area. The other corporate defendants in this action are Northern Design Products, Inc. (Northern) and Interior Design Products, Inc. (Interior). Both Northern and Interior are manufacturers' representatives for Hiebert, as they both assist Hiebert in the solicitation of business and promotion of Hiebert products. Neither Northern nor Interior actually buy or sell Hiebert products. Northern has Minneapolis as its principal place of business and Interior, a Missouri corporation, has transacted business in Minneapolis.[1] The remaining two defendants are Michael Ketcham and John Brion. Ketcham is currently president of Northern, and he previously was president of Interior. Ketcham founded both Interior and Northern.[2] Brion was formerly an employee of Ketcham's at both Northern and Interior. Prior to working for Ketcham, Brion worked at Pink. Currently, Brion is a self-employed manufacturer's representative.

In 1973, Pink began carrying the Hiebert line as one of the lines of furniture Pink sold. Hiebert terminated Pink as a dealer of Hiebert products in May of 1983. Pink claims that this termination came without warning. After the dealership termination, Pink states that it tried to return to Hiebert recently purchased merchandise, but

---

1. Interior no longer serves as a manufacturer's representative for Hiebert in the Minneapolis area.

2. Ketcham left Interior in April of 1983 to form Northern.

Hiebert would not accept it. Pink further states that it had to sell this Hiebert merchandise at a greatly reduced price. Apparently, once Pink no longer carried Hiebert merchandise, Pink's customers were reluctant to purchase Hiebert products from Pink.

At the time Hiebert terminated Pink's dealership, Hiebert had two other dealers in the Minneapolis area: Dayton's Commercial Interiors (Dayton's) and St. Paul Book & Stationery (St. Paul Book). After Hiebert terminated Pink, Hiebert designated Metropolitan Office Equipment Furniture (Metro) as another Hiebert dealer. Subsequently, Hiebert terminated St. Paul Book's dealership as well. (St. Paul Book sold only minimal amounts of office furniture.) Hiebert now states that it intends to appoint another dealer in the Minneapolis area.

Pink's termination as a Hiebert dealer came shortly after Pink secured a contract to supply the First Bank of Ridgedale with office furniture. Prior to Pink submitting its bid on the project, defendant Ketcham allegedly told Pink's president, Robert Wernick, that the First Bank of Ridgedale project was a "Dayton's spec." Pink, nevertheless, submitted a bid on the project which turned out to be the low bid. After Pink won the First Bank of Ridgedale account, Dayton's sales representative, Dick Mesjak, allegedly told Ketcham that Mesjak was upset that First Bank of Ridgedale had even requested bids for the project, because Mesjak had spent three years working on the First Bank of Ridgedale account.

Pink argues that Hiebert terminated Pink as part of a price fixing and boycott conspiracy in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.[3] Pink reasons that because it was selling Hiebert furniture at prices lower than Dayton's and other Hiebert dealers, Dayton's and defendants conspired to eliminate Pink as a dealer to remove price competition. Plain-

tiff adds that pressure from Dayton's led to the conspiracy to eliminate plaintiff's dealership.

Defendants totally deny that the termination of Pink's dealership was motivated by a desire to eliminate price competition. Defendants also deny the existence of any conspiracy or concerted action. Defendants argue that Hiebert permissibly terminated Pinks' dealership because of a concern over customer relations. Defendants further state that Pink was a free-rider in that instead of generating new business, Pink capitalized on other dealers' efforts in competing for business.

Defendant Hiebert also asserts a counterclaim for $59,179.95 for goods sold and delivered to Pink. Pink admits having received these goods, but asserts that he does not have to pay for them for a variety of reasons, including failure of consideration, estoppel, and fraud. Pink also argues that the Court should not enforce the contract obligating Pink to pay for these goods because the contract is inextricably intertwined with defendants' antitrust violations.

## DISCUSSION

### Summary Judgment

A defendant is not entitled to summary judgment unless the defendant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). Summary judgment is an extreme remedy that should not be granted unless the moving party has established a right to judgment with such clarity as to leave no room for doubt and unless the nonmoving party is not entitled to recover under any discernible circumstances. *E.g., Vette Co. v. Aetna Casualty & Surety Co.,* 612 F.2d 1076, 1077 (8th Cir.1980). In considering a summary judgment motion, a court must view the facts most favorably to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *E.g., Hartford Accident & Indem-*

---

**3.** Pink also alleges a violation of Minnesota's antitrust laws, Minn.Stat. §§ 325D.51; 325D.53, and violation of Hiebert's contractual obligation

to keep Pink as a dealer as long as Pink performed satisfactorily.

*nity Co. v. Stauffer Chemical Co.,* 741 F.2d 1142, 1144–45 (8th Cir.1984). The non-moving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Salinas v. School District of Kansas City,* 751 F.2d 288, 289 (8th Cir.1984).

■ Summary judgment " 'should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of alleged conspirators, and hostile witnesses thicken the plot.' " *Willmar Poultry Co. v. Morton-Norwich Products, Inc.,* 520 F.2d 289, 293 (8th Cir.1975), *cert. denied,* 424 U.S. 915, 96 S.Ct. 1116, 47 L.Ed.2d 320 (1976), *quoting Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Yet, "where there has been ample opportunity for discovery, summary judgment is appropriate in antitrust litigation, just as in any other litigation, upon a showing by the movant of an absence of any genuine issue of material fact." *Willmar Poultry Co.,* 520 F.2d at 293. At the time defendants made their motion for summary judgment in the present action, all parties had conducted extensive discovery and the deadline for conducting discovery had passed.

Finally, in ruling on a summary judgment motion, the Court should consider only evidence that will be admissible at trial. Fed.R.Civ.P. 56(e); *Filco v. Amana Refrigeration, Inc.,* 709 F.2d 1257, 1260 (9th Cir.), *cert. dismissed* —— U.S. ——, 104 S.Ct. 385, 78 L.Ed.2d 331 (1983); *see also McSpadden v. Mullins,* 456 F.2d 428, 430 (8th Cir.1972); *Chambers v. United States,* 357 F.2d 224, 228 (8th Cir.1966).

**Conspiracy With Agents**

■ As a preliminary issue, the Court will determine whether, as a matter of law, defendant Hiebert is capable of conspiring with defendants Northern, Interior, Ketcham, or Brion[4] within the meaning of the Sherman Act. For purposes of the Sher-man Act, a corporation cannot conspire with its own officers or employees. *Copperweld Corp. v. Independence Tube Corp.,* —— U.S. ——, 104 S.Ct. 2731, 2741, 81 L.Ed.2d 628 (1984); *Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc.,* 531 F.2d 910, 917 (8th Cir.1976). In addition, a parent corporation cannot conspire with a wholly-owned subsidiary. *Copperweld Corp.,* 104 S.Ct. at 2742.

Here, Northern and Interior are not subsidiaries of Hiebert, but rather Northern and Interior are separate corporations. As manufacturers' representatives, Northern and Interior also represent other manufacturers besides Hiebert. As employees of Northern and Interior, Ketcham and Brion were never actually employees of Hiebert. Neither ever received a salary from Hiebert, although Hiebert pays Ketcham commissions on the basis of net sales. Both sides in this litigation agree that Northern, Interior, Ketcham, and Brion were, at the relevant time, all agents of Hiebert.

■ A corporation can conspire with its agents if the agents are aware of the anti-competitive purpose for which they are being used. *Albrecht v. Herald Co.,* 390 U.S. 145, 149–50, 88 S.Ct. 869, 871–72, 19 L.Ed.2d 998 (1968). In *Albrecht* a newspaper publisher hired an outside agent to lure customers away from an independent newspaper retailer. The agent sought to convince the customers to cease delivery from the independent retailer and commence direct delivery from the publisher. The agent was partially successful in its solicitation and a number of customers switched to direct delivery from the publisher. The publisher subsequently engaged another independent retailer to deliver newspapers. The Supreme Court concluded that a combination within the meaning of the Sherman Act existed between the publisher, the solicitating agent, and the replacement independent retailer. *Albrecht,* 390 U.S. at 150, 88 S.Ct. at 872. The United States Court of Appeals for the Eighth Circuit applied *Albrecht* in finding that an airline conspired with its agent, an

---

**4.** The Court will occasionally refer to these four defendants as the "agent defendants."

advertising agency, in *International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255, 1265–66 (8th Cir.), *cert. denied*, 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980).

Prior to *International Travel Arrangers*, the Eighth Circuit stated "the general rule" was that a corporation cannot, within the meaning of the Sherman Act, conspire with its officers, employees, or agents, except where the officers or agents are acting beyond the scope of their authority or for their own benefit. *Morton Buildings*, 531 F.2d at 917 (8th Cir.1976). Subsequent to *International Travel Arrangers*, the Eighth Circuit reaffirmed the *Morton Buildings'* general rule. *Green v. Associated Milk Producers, Inc.*, 692 F.2d 1153, 1156–57 (8th Cir.1982). The pronouncements of *Morton Buildings* and *International Travel Arrangers* appear to be inconsistent,[5] but the nature of the agency relationship involved in those cases yields a method to harmonize the decisions. In *International Travel Arrangers* and *Albrecht*, the principals engaged the agents for relatively discrete tasks (*i.e.* advertising, soliciting customers). By contrast, the *Morton Buildings* court refers to agents and employees in the same breath, indicating that the agents were quite similar to employees. Thus, the Court concludes that when agents resemble employees, the *Morton Buildings* rule should apply, but where agents are retained for more discrete tasks (*e.g.* retaining an advertising agency), the *International Travel Arrangers* rule is appropriate.

Next, the Court must determine if the agent defendants in the present case more closely resemble employees or agents hired for more discrete tasks. Although neither side conceptualized the issue in this manner, they both addressed the issue of whether Hiebert could conspire with the four agent defendants. Aside from relying on *Albrecht* and *International Travel Arrangers*, plaintiff cites *Tamaron Distrib-*

*uting Corp. v. Weiner*, 418 F.2d 137 (7th Cir.1969) to support its claim that Hiebert can conspire with the four agents. *Tamaron Distributing* held that a distributor and its agent, a manufacturer's representative, could conspire with one another because they were separate legal entities. *Tamaron Distributing*, 418 F.2d at 139. The manufacturer's representative did not purchase products from the distributor, but only solicited customers, which is the function Northern and Interior perform for Hiebert. Also, like Northern and Interior, the manufacturer's representative received commissions and not a salary. Even though *Tamaron Distributing* involved facts similar to the present action, the case is of questionable authority. The *Tamaron Distributing* court relied heavily on *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) for the proposition that separate economic entities can conspire irrespective of the realities of their economic relationship. *See Tamaron Distributing*, 418 F.2d at 139. (*Perma Life Mufflers* held that a parent corporation and its wholly owned subsidiary could conspire.) The Supreme Court, however, overruled *Perma Life Mufflers* in *Copperweld*, 104 S.Ct. at 2743, 2743 n. 19, and thus *Tamaron Distributing*'s holding has been cast into doubt.

In supporting their claim that Hiebert cannot as a matter of law conspire with agents such as Northern, Interior, Ketcham, and Brion, defendants rely on a number of cases. One of these cases, *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025 (2d Cir.1979), is especially relevant. The *Fuchs Sugars* court concluded that a corporate sugar refiner could not conspire with its agents who were general brokers. The relationship between the sugar refiner and the general brokers is quite similar to the relationship between Hiebert and the four agent defendants in the present action. The general brokers in *Fuchs Sugars* did not purchase sugar, but

---

**5.** *Green* made no reference to *International Travel Arrangers*, which in turn made no refer- ence to *Morton Buildings*.

merely solicited orders. Also, the general broker represented more than one sugar refiner, which corresponds to Northern and Interior representing more than one furniture manufacturer. *See Fuchs Sugars,* 602 F.2d at 1031 n. 5.

If *Fuchs Sugars* were controlling in this circuit, it would be clear that Hiebert could not conspire with Northern, Interior, Ketcham, or Brion. Although not controlling, the case is still persuasive, and it indicates that the four agent defendants in this action closely resemble employees. Defendants point out, moreover, that the responsibilities previously performed by the agent defendants are now performed by Hiebert employees. In determining whether entities can conspire under the Sherman Act, form cannot prevail over reality. *See Copperweld,* 104 S.Ct. at 2743. Thus, the Court concludes that the agent defendants in this action closely resemble Hiebert employees and the rule of *Morton Buildings* is appropriate.

Under this rule, Hiebert can conspire with its agents only if the agents are acting beyond the scope of their authority or for their own benefit. Here, the record indicates quite the opposite, namely that the agent defendants were performing their normal duties within their authority for the benefit of Hiebert. Therefore, as a matter of law, Hiebert cannot conspire within the meaning of the Sherman Act with either Northern, Interior, Ketcham, or Brion.

Because plaintiff has not alleged that it did in fact sell furniture at a certain price as a result of pressure from Hiebert, *e.g., Albrecht,* 390 U.S. at 150 n. 6, 88 S.Ct. at 872 n. 6, the only other possible conspiracy in this lawsuit is one between Hiebert and Dayton's.

**Price Fixing**

■ Section 1 of the Sherman Act makes illegal any "contract, combination ... or conspiracy, in restraint of trade or commerce among the several States...." 15 U.S.C. § 1. This prohibition includes vertical restraints on trade. Vertical restraints are those among actors at different levels of distribution, such as restraints between manufacturers and dealers. (By contrast, horizontal restraints involve actors on the same level of productions, such as an agreement between dealers.) Vertical restraints are further divided into two types: concerted action to fix prices and concerted action to establish nonprice restraints.[6] *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). Vertical price restraints are per se illegal, while nonprice vertical restraints are subject to the "rule of reason."[7] *Monsanto,* 104 S.Ct. at 1469; *see also Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 51 n. 18, 58–59, 97 S.Ct. 2549, 2558 n. 18, 2561–2562, 53 L.Ed.2d 568 (1977).

■ While any concerted vertical action to fix prices is illegal, independent action to set prices does not constitute a violation of the Sherman Act. *Monsanto,* 104 S.Ct. at 1469. A manufacturer generally has the right to independently decide with whom it wants to do business. Thus, a manufacturer, acting independently, can refuse to do business with a dealer which does not comply with the manufacturer's wishes regarding the prices the dealer should charge. *Monsanto,* 104 S.Ct. at 1469. Yet, if a manufacturer contracts, combines, or conspires with other distributors to set resale prices, then a violation of the Sherman Act has occurred. *Monsanto,* 104 S.Ct. at 1469.

■ In a distributor termination case (*i.e.,* the plaintiff had its dealership terminated) involving a claim of concerted price fixing, the antitrust plaintiff must put forth sufficient evidence to establish an agreement to fix prices. *Monsanto,* 104 S.Ct. at 1470. Evidence of other distribu-

---

**6.** Examples of nonprice restrictions are a manufacturer limiting the territory in which a dealer can sell, or limiting the customers to whom a dealer can sell.

**7.** The "rule of reason" involves a weighing of relevant factors in each case to determine if a restrictive practice is an unreasonable restraint on competition. *Monsanto,* 104 S.Ct. at 1469.

tors complaining about the plaintiff's price cutting efforts prior to the termination of the plaintiff's dealership, while probative, is not sufficient in itself to establish an agreement. *Monsanto*, 104 S.Ct. at 1470–71, 1471 n. 8. Instead, a plaintiff must put forth evidence which tends to negate the possibility that the manufacturer acted independently. *Monsanto*, 104 S.Ct. at 1471. A plaintiff must introduce

> direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others "had a conscious commitment to a common scheme designed to achieve an unlawful objective."

*Monsanto*, 104 S.Ct. at 1471 (quotation omitted). *Monsanto* involved review of a jury verdict and not a summary judgment motion. Thus, for plaintiff to defeat defendants' motion for summary judgment, plaintiff does not have to satisfy the *Monsanto* standard. Rather, plaintiff must show that a jury might reasonably conclude that plaintiff satisfied this standard. *American Dermatologists' Medical Group, Inc. v. Collagen Corp.*, 595 F.Supp. 79, 82 (N.D.Ill.1984).

## A. Termination Motivated by Pricing

██ Here, defendants argue that plaintiff has not produced any evidence to support plaintiff's claim of a resale price fixing scheme. Plaintiff notes that Hiebert did supply its dealers with suggested resale price lists, but that does not appear to be an unusual practice in the industry. (Brion 39).[8] Moreover, Pink's president, Wernick, stated that he or his staff established all the prices at which Pink would sell Hiebert products (Wernick 42–43; 60–61). Defendants also note that plaintiff has not produced any evidence that Hiebert tried to influence the other Hiebert dealers in the Minneapolis area. Finally, defendants stress that plaintiff has not produced any evi-

dence that defendants ever talked to plaintiff about the prices plaintiff should charge. Defendants are correct that plaintiff has not come forth with any evidence that defendants explicitly told plaintiff how to price Hiebert products. Defendants are also correct that numerous employees of plaintiff stated that defendants never even brought up the topic of plaintiff's pricing of Hiebert products.[9]

Plaintiff does, however, put forth evidence which could reasonably support a finding that Hiebert's motivation for terminating Pink's dealership was Pink's pricing. Initially, Pink eliminates a number of legitimate nonprice reasons for the termination of its dealership, *e.g.*, Hiebert admits the termination was not the result of consumers complaining about Pink. Pink also casts some doubt on Hiebert's claim that Pink was a free-rider, because Pink claims that it did generate sufficient new business. The memorandum which Ketcham wrote to Hiebert suggesting termination of Pink's dealership, further indicates that Hiebert was concerned about Pink's pricing. The memorandum listed the number one reason for termination as "Bid to [sic] low. 46% off or more." (Ketcham Exh. 15).

Although ambiguous, the "Dayton spec." statements also arguably support plaintiff's claim that Hiebert's motivation for terminating Pink's dealership was Pink's pricing. Before Pink submitted its bid on the First Bank of Ridgedale contract, Ketcham allegedly told Wernick that First Bank of Ridgedale was a "Dayton's spec."[10] (Wernick 67). After Pink won the First Bank of Ridgedale contract, but before the termination, Ketcham visited Wernick's office and purportedly reminded Wernick that the job was a "Dayton's

**8.** Citations to a name followed by numbers refer to a deposition and its relevant pages. A name followed by an exhibit number denotes a deposition exhibit.

**9.** *See, e.g.*, (Doyle 24; Loomis 20–21; Pitra 9; Prindle 13; Ritchie 17; Ruter 39–41; Venero 20).

**10.** "Spec." is slang for specification. In the office furniture business, customers can "specify" a particular brand of office furniture in their orders. Also a furniture distributor may be said to have a "spec.," *e.g.*, a Dayton's "spec.," if it convinced the customer to specify a certain line of furniture.

spec." Ketcham also allegedly stated that he would "lack ... credibility in the marketplace if he [Ketcham] couldn't control his dealers." (Wernick 71). After the termination, according to Wernick, Ketcham told Wernick that "neither Dayton's nor [Pink] could make a profit at the price levels" which Pink was charging. (Wernick 78). Ketcham also allegedly said that Pink was pricing very low with a Honeywell project. (Wernick 119).

Defendants correctly argue that Ketcham's alleged statements after the termination of Pink's dealership could not have constituted an attempt to influence Pink's future pricing of Hiebert products because Pink was no longer a Hiebert dealer. Defendants also point out that Wernick admits that Ketcham never explicitly told Wernick what Pink should bid on the First Bank of Ridgedale project, and that Ketcham never even mentioned pricing. (Wernick 67–71). Defendants conclude that at most, any restrictions Hiebert might have attempted to impose on Pink were valid customer restrictions.[11]

In sum, while defendants have strong arguments that the evidence reviewed thus far relates only to nonprice restrictions, this evidence does seem sufficient to allow a jury to conclude that Hiebert terminated plaintiff because of the low prices which plaintiff was charging.

**B. Concerted Action**

■ Plaintiff making an adequate showing on the specific issue of Hiebert's motivation, however, does not in itself allow plaintiff to survive defendants' motion for summary judgment. An independent decision by Hiebert to terminate plaintiff because plaintiff was a price cutter is not a violation of the Sherman Act. *Monsanto,* 104 S.Ct. at 1469; *United States v. Colgate*

& *Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). Plaintiff must ultimately establish that the termination of their dealership was the result of a contract, combination, or conspiracy to cut prices. *Monsanto,* 104 S.Ct. at 1469. Plaintiff cannot meet this ultimate burden solely by showing that Hiebert terminated plaintiff's dealership after Hiebert received complaints from other dealers regarding plaintiff's pricing. *Monsanto,* 104 S.Ct. at 1470–71. Neither can plaintiff meet this ultimate burden solely by demonstrating that Hiebert terminated plaintiff's dealership "in response to" other dealers' complaints concerning plaintiff's pricing. *Monsanto,* 104 S.Ct. at 1470. The key issue on this summary judgment motion, therefore, is whether plaintiff has admissible evidence beyond mere dealer complaints sufficient enough to allow a jury to reasonably conclude that a conspiracy to fix prices existed. *See American Dermatologists',* 595 F.Supp. at 82.

**1. Insufficient Evidence**

Plaintiff, of course, states that it has put forth ample admissible evidence of concerted action to fix prices. For instance, plaintiff states that its evidence excluding legitimate reasons for the termination (mentioned previously) tends to exclude the possibility that Hiebert acted independently. *Citing Monsanto,* 104 S.Ct. at 1471 ("must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently"). As previously stated, this evidence could show that Hiebert was concerned about Pink's pricing, but this evidence does not indicate that Hiebert in any way acted other than independently. Thus, this evidence does not tend to show that Hiebert and others engaged in concerted action.

---

11. Nonprice vertical restraints, such as customer restrictions, must be unreasonable before they constitute antitrust violations. *Monsanto,* 104 S.Ct. at 1469. Plaintiff does not, however, argue in its brief that defendants violated the Sherman Act via nonprice restraints. If plaintiff was going to assert such a theory, plaintiff would ultimately have to demonstrate that the

nonprice restraints were unreasonable. Defendants repeatedly try to characterize their actions as, at worst, nonprice or customer restraints. In light of plaintiff's position, if defendants' actions only amounted to nonprice or customer restraints, defendants would not be liable to plaintiff for Sherman Act violations.

Next, plaintiff points to a variety of evidence which plaintiff claims is "relevant background" evidence of shared concerns about dealer profits between Hiebert and its dealers. Dayton's officials testified that Dayton's wants many customers and tries to obtain the highest profit margin possible. Hiebert's former vice president, Grant Seltzer, testified that Hiebert is interested in the profits of its dealers and that Hiebert is concerned about preventing dealer profits declines. (Seltzer 61–62, 64). In reference to Hiebert's concerns about how much business dealers in a local market would generate, Seltzer stated "I think that you need a meeting of the minds as to what you're going to do business-wise." (Seltzer 52). Finally, Seltzer stated that he assumed local Hiebert representatives discussed with local dealers the latter's sales volumes.

Jerome Loomis, an employee of Metro,[12] states that Hiebert representative (and defendant) Ketcham frequently talks to Loomis about sales meetings and pricing questions. (Loomis 39). Ketcham himself stated that he hoped Minneapolis area Hiebert dealers would be respectful of each others' profits. (Ketcham 209).

Again, plaintiff notes that Hiebert publishes a suggested list of prices, and plaintiff also points to a December 16, 1979 memorandum Hiebert sent to all of its dealers. The memorandum stated, in part:

CONFIDENTIAL:
OUR NEW SEATING PRICE LIST REPRESENTS AN OPPORTUNITY FOR YOU TO *INCREASE YOUR PROFITS* BY SELLING HIEBERT SEATING....
WE HAVE BEEN SENSITIVE TO THE DECLINING PROFIT PICTURE IN OUR INDUSTRY....
WE OF COURSE FEEL THIS IS AN INCENTIVE FOR YOU, TO INCREASE YOUR HIEBERT SEATING SALES AND YOUR PROFITS....

(Carpenter Exh. 15). The memorandum offered dealers an increased discount if dealers purchased Hiebert fabric for seating covers instead of other fabrics. (*See* Seltzer 62).

Plaintiff deemed the evidence recapped in the preceding three paragraphs as relevant background of shared concerns about dealer profits between Hiebert and its dealers. This "relevant background" label appears to be an implicit concession that this evidence, by itself, is not sufficient to allow a reasonable inference of a conspiracy. Dayton's desire to obtain many customers and to maximize profits, for instance, is perfectly natural, as is Hiebert's supplying a suggested price list. Neither is Hiebert's discussions of pricing with its distributors inherently suspect because "[a] manufacturer and its distributors have legitimate reasons to exchange information about prices and the reception of their products in the market." *Monsanto*, 104 S.Ct. at 1470. Hiebert also exhibited concern over the profits of its dealers, but manufacturers will often be legitimately concerned about the profitability of their dealers. *Monsanto*, 104 S.Ct. at 1470. The confidential memorandum to which plaintiff points shows nothing more than Hiebert offering its dealers a good deal because Hiebert was concerned about dealer profits. This memorandum is in sharp contrast to the newsletter the Supreme Court found to be evidence of a conspiracy or agreement in *Monsanto*. The newsletter in *Monsanto* spoke of the defendant's attempt to "get[ ] the 'market place in order,'" and stated that defendant would make "every effort ... to maintain a minimum market price level." *Monsanto*, 104 S.Ct. at 1471. A distributor of the defendant issued this newsletter four weeks before the defendant terminated the plaintiff's dealership, but here Hiebert issued its memorandum three and one-half years before it terminated plaintiff's dealership. Thus, while not irrelevant, all plaintiff's background evidence does not provide sufficient evidence to permit a reasonable inference that a conspiracy existed.

12. Metro is the dealer which replaced plaintiff.

In addition to its relevant background evidence, plaintiff states that a variety of evidence does establish that a conspiracy existed. The Court has already mentioned some of this evidence, concluding that the evidence could show only that Hiebert was concerned about pricing and not that a conspiracy existed, *e.g.*, Ketcham telling Wernick that the First Bank project was a "Dayton's spec."

Another piece of evidence worth reviewing is the memorandum Ketcham wrote to Hiebert suggesting termination of plaintiff's dealership. Ketcham listed plaintiff's low bids as his number one reason for suggesting termination. Plaintiff reasons that this document indicates that Hiebert, Interior, Northern, and Ketcham acted in concert to eliminate plaintiff as a dealer. This argument fails for two reasons. Initially, the memorandum is analogous to a dealer complaint, and dealer complaints are not sufficient to support a finding of conspiracy. More importantly, as a matter of law, Hiebert is incapable of conspiring with Northern, Interior, Ketcham, and Brion.

Plaintiff also points to testimony of Ketcham concerning a conversation with a Dayton's sales representative, Dick Mesjak. After plaintiff won the First Bank contract, Mesjak called Ketcham. Mesjak indicated that he was upset that the bank even put out bids for the project because he had worked three years on the account. (Ketcham 109). Ketcham further testified, however, that Mesjak did not ask Ketcham to take any action in response to Mesjak's complaint, nor did Mesjak ask Ketcham to speak with the bank. (Ketcham 109). Defendants do not challenge the admissibility of this evidence, but they do state that the evidence is not helpful to plaintiff. Defendants appear to be correct that Mesjak's statements do not deal with price fixing but only customer restraints. Even if Mesjak's statements relate to price, the statements amount to nothing more than a dealer complaint.

## 2. Inadmissible Evidence

Plaintiff does point to certain evidence, which, if admissible, might tend to estab-

lish the existence of a conspiracy. Defendants strongly contest the admissibility of this evidence.

Plaintiff first notes that Loomis of Metro testified that he heard "rumors" that Hiebert terminated Pink's dealership because Pink was a price cutter. The rumors further indicated that Wernick was very aggressive and that the other dealers did not like Wernick's presence in the market place. (Loomis 42–43). Loomis testifying about rumors, of course, is clearly hearsay. Plaintiff does not even attempt to force Loomis' testimony into one of the hearsay exceptions.

A statement which plaintiff does strenuously try to fit into a hearsay exception is the statement of Dayton's employee Herb Polachek. Polachek, then director of Dayton's Commercial Interiors, was playing golf with an independent manufacturer's representative, Tom Hendrickson, in late summer or early fall of 1983. During the round of golf, Polachek allegedly discussed Hiebert's termination of Pink's dealership, but Polachek does not recall discussing that topic with Hendrickson. (Polachek 79). Hendrickson later recapped his conversation with Polachek to Pink employee Pitra. Pitra will testify that Hendrickson told her some Dayton's people said that Hiebert dropped Pink because of Pink's competitive pricing and because of pressure from Dayton's. (Pitra 33–34). Hendrickson's own affidavit is less dramatic, as he says that Polachek stated that Dayton's sales vice president and Ketcham had some conversations before Pink's termination. According to Hendrickson, Polachek also stated that he thought there had been a "test run" before the termination. (No explanation is given as to what a "test run" means.) Finally, Hendrickson acknowledges having a conversation with Pitra, but he cannot recall the specifics of that conversation.

Defendants argue that Pitra testifying about this conversation would be inadmissible double hearsay. Plaintiff puts forth a number of justifications for admis-

sibility of this testimony but these arguments do not support the conclusion that Pitra can testify about what Polachek said. Whether Hendrickson can testify about Polachek's statement is a closer issue. Plaintiff first argues that Polachek's statement is admissible because it is a statement by a coconspirator during the course of and in furtherance of a conspiracy. Fed.R.Evid. 801(d)(2)(E). Before a statement is admissible under Rule 801(d)(2)(E), other independent evidence of concerted action must be present, but the proponent of the statement need only show a "likelihood of illicit association" involving the declarant. *United States v. Shursen*, 649 F.2d 1250, 1256 (8th Cir.1981). Here, defendants argue that no independent evidence of a conspiracy exists. Even if independent evidence of a conspiracy existed, Polachek's remark would have to be in furtherance of a conspiracy. Plaintiff reasons that Polachek's statement was in furtherance of a conspiracy because he was implicitly warning Hendrickson not to under sell Dayton's. Hendrickson's affidavit (and even Pitra's deposition), however, do not indicate that Polachek's statement was in any way a threat. Thus, Polachek's statement is not admissible under Rule 801(d)(2)(E).

■ Plaintiff's second rationale for admitting Polachek's statement is that the statement is a declaration against Polachek's interest. Fed.R.Evid. 804(b)(3). Plaintiff is correct that Polachek's failure to recall this conversation satisfies the rule's definition of an unavailable declarant. Fed.R.Evid. 804(a)(3). The rule also requires that at the time a statement was made, it was so far contrary to the declarant's interest that a reasonable person in the declarant's position would not have made the statement· unless it was true. Fed.R.Evid. 804(b)(3). Plaintiff reasons that the statement qualifies because Polachek was implicating Dayton's in a price fixing conspiracy and thus Polachek was exposing his employer and himself to civil liability. This argument assumes that it would be obvious to Polachek that in making his remark he would be exposing himself to civil liability. Yet, making a statement which a plaintiff might later use to assert a claim of vertical price-fixing is in sharp contrast to admitting something obviously inculpatory like running a red light and causing an accident. Plaintiff has offered no indication that at the time he allegedly made his statement, Polachek had any understanding of verticle price-fixing. To the contrary, Polachek testified in his deposition that he never had any business law course in college. (Polachek 7). Polachek's alleged remark, therefore, was not so far contrary to his interests that a reasonable person would have only made the statement if true.

■ Finally, plaintiff states that Polachek's statement is admissible under the catch all or "other" hearsay exceptions of Federal Rules Evidence 803(24) and 804(b)(5). These exceptions are the last resort for proponents of evidence when evidence does not qualify for admission under established hearsay exceptions. These exceptions are appropriately used when evidence does not squarely fit into a hearsay exception, but nonetheless the evidence has circumstantial guarantees of trustworthiness equivalent to the other hearsay exceptions. Fed.R.Evid. 803(24) and 804(b)(5). Plaintiff states that because Polachek made this statement shortly after Pink's termination, the statement is of increased reliability. A statement being made contemporaneous to or shortly after an event is an indication of reliability. *See United States v. Van Lufkins*, 676 F.2d 1189, 1192 (8th Cir.1982). Here, plaintiff's termination took place in May of 1983 and Polachek allegedly made his statement in August of that year. While this time period is not excessively long, it is not at all contemporaneous with the relevant event. In *Van Lufkins*, moreover, the hearsay statement admitted under Rule 804(b)(5) because it was shortly after the event took place within one week after the relevant event. (Another hearsay statement which took place more than six months after the relevant event was also admitted under Rule 804(b)(5). The rationale for admission, however, was that the evidence was trust-

worthy because it was corroborated by other evidence, and not because it was made shortly after the event.) In advocating the use of the catch all exceptions, plaintiff does make the legitimate point that both Hendrickson and Polachek will be available for cross examination. Nevertheless, the Court will not allow Polachek's statement into evidence under the catch all exceptions. Over use of the catch all exceptions can lead to the destruction of the hearsay rule, and plaintiff simply has not demonstrated the necessary "equivalent circumstantial guarantees of trustworthiness." In conclusion, neither Hendrickson nor Pitra can properly testify about Polachek's statement.

Another statement which plaintiff vigorously argues is admissible is a statement allegedly made by defendant Brion to Pitra. After the termination, Brion purportedly told Pitra that Hiebert eliminated Pink as a dealer because of "general pressure from Dayton's, and the straw that broke the camel's back virtually was the First Bank job." (Pitra 39). At the time Brion allegedly made this remark, he was no longer employed by Northern. Brion denies making this statement, but Pitra will testify that Brion did make it. If admissible, this testimony could indicate concerted action between Dayton's and Hiebert.[13]

Plaintiff offers a number of justifications for the admissibility of Brion's statement. Plaintiff reasons that Pitra can testify as to what defendant Brion said because Brion's statement is an admission of a party-opponent. Fed.R.Evid. 801(d)(2)(A). Defendants contend that plaintiff named Brion as a defendant in order to provide a basis for admissibility of Brion's statement. At most, reason defendants, Brion's statement is admissible against Brion, but inadmissible to prove a conspiracy between Hiebert and Dayton's. Defendants are correct that Brion's statement can only be used against Brion, *Battle v. Lubrizol Corp.*, 673 F.2d 984, 990 (8th Cir.1982), *aff'd on other grounds by an equally divided court*, 712 F.2d 1238 (8th Cir.1983) (en banc), *cert. denied*, —— U.S. ——, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984); *Filco*, 709 F.2d at 1267, and the Court has previously concluded that plaintiff must put forth evidence of a conspiracy between Hiebert and Dayton's.

If Brion's remark qualified as a statement of a coconspirator under Rule 801(d)(2)(E), then it would be admissible to establish a conspiracy between Hiebert and Dayton's. Plaintiff asserts that Brion's statement does qualify under this rule because the statement is that of a coconspirator made in furtherance of a conspiracy. Plaintiff has not, however, put forth other independent evidence of a conspiracy, which is a necessary for admissibility under Rule 801(d)(2)(E). *Shursen*, 649 F.2d at 1256. Neither is Brion's statement in furtherance of a conspiracy. At the time he purportedly made this remark, he no longer worked for Northern. Moreover, his statement in no way furthers a conspiracy because it does not constitute a threat to other dealers.

As in the case of the Polachek statement, plaintiff argues that Brion's statement is admissible as a declaration against interest, Fed.R.Evid. 804(b)(3), and under the catch all hearsay exceptions. Fed.R.Evid. 803(24) and 804(b)(5). Yet just as these hearsay exceptions do not justify the admission of Polachek's remark, neither do they justify the admission of Brion's statement. Brion's statement purportedlly exposing him to liability for a vertical price-fixing scheme, was not so far contrary to his interest that a reasonable person would not have made it unless true. Brion had taken a course in college which did include antitrust as a topic. (Brion 5). Neverthe-

---

**13.** *Defendants argue that even if Pitra can testify to Brion's statement, the statement makes no reference to price. Defendants are correct, but other evidence has shown that plaintiff's pricing may have been a factor causing Hiebert to terminate plaintiff's dealership. Thus, if plaintiff* had admissible evidence of any type of concerted action, that evidence coupled with the other evidence of Hiebert's concern over plaintiff's pricing, might support a reasonable inference of a vertical price-fixing conspiracy.

less, plaintiff has made no showing that Brion was aware of his potential civil liability for vertical price-fixing. Such a showing is necessary because a reasonable person would have no idea that a statement such as Brion's could expose the declarant to civil liability. Admission under the catch all exceptions is also not warranted because plaintiff has not established circumstantial guarantees of trustworthiness equivalent to the other hearsay exceptions.

As has been seen, plaintiff's extensive discovery in this litigation has failed to produce admissible evidence which could support a reasonable finding of concerted action to fix prices. Summary judgment is therefore appropriate.[14]

**Counterclaim**

 Even though plaintiff admits that it received goods from Hiebert and that plaintiff did not pay Hiebert for those goods, defendant Hiebert is not entitled to summary judgment on its counterclaim for the price of the goods sold and delivered. Because plaintiff's federal antitrust claims have proven unsuccessful, plaintiff cannot use these claims as a defense to Hiebert's counterclaim.[15] Yet, simply because plaintiff cannot raise antitrust allegations as a defense to Hiebert's counterclaim, it does not follow that plaintiff cannot raise other defenses. *See Kelly v. Kosuga*, 358 U.S. 516, 517 n. 1, 79 S.Ct. 429, 430 n. 1, 3 L.Ed.2d 475 (1959). In addition to its Sherman Act defense, plaintiff has asserted a number of other defenses including failure of consideration, waiver, and estoppel. Defendant Hiebert argues that plaintiff should be held only to its Sherman Act defense because plaintiff's president testified at a deposition that the reason plaintiff was not paying for the goods was because plaintiff's antitrust damages exceeded the

price of the goods. (Wernick 271–72). The Court, however, will not limit a litigant's legal defenses because of a layperson's understanding of those defenses. Wernick, moreover, did not testify that plaintiff's antitrust damages exceeded the price of the goods, but only that plaintiff's "claims ..., whether by antitrust or otherwise, exceed[ed] the value" of the goods. (Wernick 272).

**State Claims**

 Summary judgment not being appropriate on Hiebert's counterclaim, the question before the Court becomes whether the Court should retain jurisdiction over Hiebert's counterclaim or should dismiss the counterclaim without prejudice. This same issue is also present with respect to plaintiff's remaining state claims. In determining whether to proceed to trial on pendant state claims, or to leave pendant claims for trial in state court, a number of considerations are relevant. *Koke v. Stifel, Nicolaus & Co.*, 620 F.2d 1340, 1346 (8th Cir.1980). These considerations are:

the difficulty of the state claim, the amount of judicial time and energy already invested in it, the amount of additional time and energy necessary for its resolution, and the availability of a state forum.

*Koke*, 620 F.2d at 1346.

 Here, very little of the judicial time and energy devoted to this action has concerned the state law issues. While the parties have engaged in extensive discovery in this action, those efforts would not need to be duplicated for a state court action. *See Koke*, 620 F.2d at 1347. No party, moreover, has indicated that a state forum would be unavailable because of

---

**14.** Plaintiff apparently has abandoned its claim of an illegal boycott conspiracy, Count II of plaintiff's complaint. Plaintiff's only reference to this claim was a footnote in its brief which stated that the same evidence which establishes plaintiff's price-fixing claim also establishes plaintiff's illegal boycott claim. Because plaintiff's evidence cannot support a reasonable inference of the former, it cannot support a reasonable inference of the latter.

**15.** The Court need not decide the question of whether plaintiff could use its federal antitrust claims as defenses to Hiebert's counterclaim if those claims had survived summary judgment. *See Kelly v. Kosuga*, 358 U.S. 516, 520, 79 S.Ct. 429, 432, 3 L.Ed.2d 475 (1959); *Bruce's Juices, Inc. v. American Can Co.*, 330 U.S. 743, 755, 67 S.Ct. 1015, 1020, 91 L.Ed. 1219 (1947).

**1348**

statute of limitations problems or for any other reason. Finally, the trial of the remaining state law claims could involve difficult questions of state law, and the resolution of those questions is best left for the state tribunals.

The federal district court in *Green v. Associated Milk Producers, Inc.*, 1981-2 Trade Cases (CCH) ¶ 64,346 (Sept. 30, 1981), *aff'd*, 692 F.2d 1153 (8th Cir.1982) faced a similar situation. The district court granted the defendants' motion for summary judgment on plaintiffs' federal antitrust claims. The plaintiffs had also asserted claims under the Minnesota Antitrust Law of 1971, Minn.Stat. §§ 325D.49–.66 and various common law claims, while one defendant had asserted a counterclaim for breach of contract. The district court dismissed all of these state law claims without prejudice, and the Eighth Circuit implicitly approved of this resolution. *See Green*, 692 F.2d at 1154 n. 4.

The Court concludes that a similar resolution would be appropriate in the instant case, and thus the Court will dismiss all remaining claims without prejudice.

Based on the foregoing, IT IS ORDERED that defendant's motion for summary judgment on plaintiff's federal antitrust claims, counts I and II, is granted.

IT IS FURTHER ORDERED that defendant Hiebert's motion for summary judgment on its counterclaim is denied. Defendant Hiebert's counterclaim is dismissed without prejudice.

IT IS FURTHER ORDERED that plaintiff's remaining claims, counts III and IV, are dismissed without prejudice.

LET JUDGMENT BE ENTERED ACCORDINGLY.