788 F.2d 1313
 1986-1 Trade Cases 67,046
 PINK SUPPLY CORP., Appellant/Cross-Appellee,
v.
HIEBERT, INC., Northern Design Products, Inc., Interior
Design Products, Michael Ketchum and John Brion,
Appellees/Cross-Appellants.
 Nos. 85-5180, 85-5195.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 11, 1985.
Decided April 14, 1986.
 
 Bradley G. Clary, St. Paul, Minn., for appellant/cross-appellee.
 Daniel R. Shulman, Minneapolis, Minn., for appellees/cross-appellants.
 Before ROSS, Circuit Judge, BRIGHT, Senior Circuit Judge, and BOWMAN, Circuit Judge.
 ROSS, Circuit Judge.
 
 
 1
 After its termination as a dealer in office furniture manufactured by Hiebert, Inc., appellant, Pink Supply Corporation, brought this antitrust action against appellees, Hiebert and four sales representatives, alleging a price-fixing and boycott conspiracy in violation of section 1 of the Sherman Act, 15 U.S.C. Sec. 1 (1982). In addition, the complaint alleged a similar conspiracy between Hiebert and another dealer, Dayton's Commercial Interiors, not a party to this action. Upon completion of discovery, the district court[1] granted the appellees' motion for summary judgment,[2] finding an absence of concerted action within the meaning of the Sherman Act.[3] Specifically, the district court concluded that the sales representatives, as agents in the nature of employees, could not as a matter of law conspire with Hiebert, their principal, and that Pink Supply had offered insufficient admissible evidence of a conspiracy between Hiebert and its dealer, Dayton's, on which to proceed to trial. We affirm.
 
 I.
 
 2
 The sales representatives named by appellant as coconspirators with Hiebert were Interior Design Products, Inc.; Northern Design Products, Inc., a successor corporation to Interior Design; Michael Ketchum, founder and president of the design corporations, and John Brion, an employee in Ketchum's companies and formerly an employee of Pink Supply. At all relevant times, the representatives served as commissioned sales agents for Hiebert. Appellant alleged that the representatives conspired with Hiebert to eliminate Pink Supply's dealership in an effort to fix resale prices in Hiebert furniture.
 
 
 3
 The Supreme Court has recently reiterated that section 1 of the Sherman Act prohibits only those unreasonable restraints of trade which are "effected by a 'contract, combination * * *, or conspiracy' between separate entities." Fisher v. City of Berkeley, --- U.S. ----, 106 S.Ct. 1045, 1049, 89 L.Ed.2d 206 (1986), quoting Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984) (emphasis in original).
 
 
 4
 The economic substance of the relationship between two entities determines whether they are "separate" for purposes of a section 1 conspiracy. A corporation cannot, for example, conspire with its own officers and employees. Copperweld, supra, 104 S.Ct. at 2741. "The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals." Id. Similarly, a parent corporation and its wholly owned subsidiary, even if separately incorporated, are not legally capable of conspiracy because their normal relationship necessarily involves a unity of economic interest. Id. at 2742:
 
 
 5
 A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for Sec. 1 scrutiny.
 
 
 6
 The inherent unity of economic interest and purpose which characterizes the relationship between a corporation and its officers, employees and wholly owned subsidiaries also precludes a finding of conspiracy between a corporation and certain agents. Corporate agents, even if separately incorporated, who function as an integral part of the corporate entity, represent no separate step in the distribution chain, act for the corporate principal's benefit and are functionally indistinguishable from employees, may lack the independent economic consciousness necessary to be considered conspirators separate from their principal. See, e.g., Fuchs Sugars & Syrups, Inc. v. Amstar Corp., 602 F.2d 1025, 1028-31 (2d Cir.), cert. denied, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979).
 
 
 7
 The sales representatives, unlike Hiebert's dealers, did not stock furniture for resale, sell Hiebert furniture, arrange shipment or install or service merchandise. Their sole function in the context of Hiebert's organization was to generate business by persuading potential customers to select the Hiebert line. The representatives had no authority to set prices, no discretion to arrange terms of sale and no ability to accept orders. Orders generated through their efforts had to be approved by Hiebert and were filled by Hiebert or its dealers. The representatives assumed no credit risk in connection with a sale and bore no risk of loss or injury to the goods.
 
 
 8
 Customers selected the source from which Hiebert furniture orders were filled. When customers required bids, Hiebert dealers within the applicable trade territory could compete against each other. The selection of Hiebert or a particular dealer to fill an order could be based on factors such as price, inventory in stock, design services and other considerations motivating customer choice. The sales representatives did not compete with Hiebert or its dealers in any sense; nor did they designate the source through which a particular sale was placed.
 
 
 9
 Both Hiebert and its dealers benefited from the representatives' promotional efforts. Some dealer business, including that of Pink Supply, was generated by the representatives at no cost to the dealers. While the dealers made their profit from the retail mark-up over the wholesale price of the furniture, the representatives received a commission based upon total sales of Hiebert products within their territory. Hiebert, not the dealers, paid the commission.
 
 
 10
 The representatives therefore did not constitute an independent step in the Hiebert distribution process. They served no purpose other than the promotion of products on behalf of Hiebert and other represented manufacturers. See Fuchs Sugars, supra, 602 F.2d at 1028. Currently Hiebert no longer employs sales representatives and uses its own employees to perform the functions previously assigned to the representatives. We conclude that viewed from the perspective of Hiebert's organization, the sales agents were so closely intertwined in economic interest and purpose with Hiebert as to amount to a unified economic consciousness incapable of conspiring with itself. We reach this conclusion notwithstanding the representatives' separate ownership and incorporation. Cf. Copperweld, supra, 104 S.Ct. at 2743 n. 21 ("[S]eparate incorporation does not necessarily imply a capacity to conspire. * * * [S]ubstance, not form, should determine whether a separately incorporated entity is capable of conspiring under Sec. 1.")
 
 
 11
 We have, however, recognized an exception to the general principle that a corporation cannot conspire with agents of this kind. When the interests of principal and agents diverge, and the agents at the time of the conspiracy are acting beyond the scope of their authority or for their own benefit rather than that of the principal, they may be legally capable of engaging in an antitrust conspiracy with their corporate principal. See Green v. Associated Milk Producers, Inc., 692 F.2d 1153, 1156-57 (8th Cir.1982); Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc., 531 F.2d 910, 916-17 (8th Cir.1976). Accord Victorian House, Inc. v. Fisher Camuto Corp., 769 F.2d 466, 469 (8th Cir.1985).
 
 
 12
 The district court analyzed the relationship between Hiebert and the representatives in light of the Morton Buildings and Green exception and found that the representatives never exceeded the scope of their authority and at all relevant times "were performing their normal duties within their authority for the benefit of Hiebert." Pink Supply Corp. v. Hiebert, Inc., 612 F.Supp. 1334, 1340 (D.Minn.1985). Our review of the record has revealed no evidence to the contrary.
 
 
 13
 On appeal, Pink Supply contends that the district court erred in two respects. Appellant first urges that the evidence sufficiently raised an issue of fact regarding whether the representatives were acting for their own benefit in recommending appellant's termination as a Hiebert dealer.
 
 
 14
 Pink Supply had ignored Michael Ketchum's suggestion to Robert Wernick, appellant's president, that a particular project, the First Bank of Ridgedale contract, was a "Dayton's spec." Dayton's, a major Hiebert dealer in competition with Pink Supply, had invested several years of design and sales efforts in the bank project but lost the contract to Pink Supply's lower bid. Appellant's theory is that Ketchum sought Pink Supply's termination in an effort to control dealer pricing and in order to protect his credibility in the marketplace.
 
 
 15
 On the issue of dealer pricing, however, appellant offered no evidence suggesting a personal benefit to Ketchum or his companies from appellant's adherence to particular resale price levels or any economic detriment to the representatives from appellant's price-cutting. Pink Supply and the representatives were not competitors. Moreover, as the district court noted, appellant's own employees testified that the appellees did not discuss or otherwise attempt to direct Pink Supply's pricing of Hiebert products. Id. at 1341.
 
 
 16
 As for the credibility motive, no evidence was offered to connect the status of Ketchum's credibility to any particular financial gain or loss in the marketplace. It was not the representatives' function to select the dealer who filled a particular furniture order. Moreover, since the representatives received a commission directly from Hiebert based on total sales in the trade area to which the representatives were assigned, it was economically irrelevant to them which dealer actually placed a sale.
 
 
 17
 Our decisions have required more than mere speculation regarding the benefit to an agent to be realized from participation in a conspiracy with the principal. Unlike the sales agent in Victorian House, supra, Hiebert's sales representatives derived no financial benefit from the elimination of Pink Supply from the Hiebert organization.[4] We construe "for the agent's own benefit" to mean at least an economic stake in the gain to be realized from the anticompetitive object of the conspiracy. See Holter v. Moore and Co., 702 F.2d 854, 857 n. 8 (10th Cir.), cert. denied, 464 U.S. 937, 104 S.Ct. 347, 78 L.Ed.2d 313 (1983); H & B Equipment Co. v. International Harvester Co., 577 F.2d 239, 244 (5th Cir.1978).
 
 
 18
 Appellant next asserts that Albrecht v. Herald Co., 390 U.S. 145, 150, 88 S.Ct. 869, 871-72, 19 L.Ed.2d 998 (1968) and International Travel Arrangers, Inc. v. Western Airlines, Inc., 623 F.2d 1255, 1266 (8th Cir.), cert. denied, 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980), authorize a finding of conspiracy between a corporation and its agents if the agents are aware of the anticompetitive purpose for which they are being used. Appellant contends that the sales representatives were fully aware of the price-related purpose to be served by Pink Supply's termination.
 
 
 19
 The agents in Albrecht (a customer solicitation firm) and International Travel (an advertising agency) were separate economic units completely distinct from their corporate principals. The agents had played no prior role in the corporate organizations or distribution process. They were hired for the specific purpose of engaging in a course of anticompetitive conduct and did so, aware of that purpose, which they materially aided in accomplishing. The relationship between the Albrecht and International Travel agents and their principals therefore unquestionably represented the joining of previously divergent economic interests and "corporate consciousnesses" which Copperweld indicates is essential to provide "the plurality of actors imperative for a Sec. 1 conspiracy." Copperweld, supra, 104 S.Ct. at 2741, 2742.
 
 
 20
 Thus the Albrecht and International Travel test for capacity to conspire may appropriately apply when two entirely separate economic units join together as principal and agent for the purpose of engaging in anticompetitive conduct. However, when the agent is already engaged in an ongoing relation with the principal built around the agent's knowing and active participation in serving the principal's interests, that fact alone cannot determine capacity of the two to conspire. Cf. Copperweld, supra, 104 S.Ct. at 2734-35, 2742-45 (notwithstanding joint awareness of the anticompetitive purpose to be served and active participation by both parent corporation and wholly owned subsidiary in accomplishing that purpose, the two are not legally capable of combination or conspiracy within the meaning of section 1).
 
 
 21
 We conclude, therefore, that the district court was correct in applying the Morton Buildings and Green test, rather than the Albrecht and International Travel test, concerning the agents' capacity to conspire with Hiebert.[5] Moreover, we agree with the district court that the representatives did not exceed the scope of their authority or act for their own economic benefit in recommending appellant's termination. We find no evidence in the record which would support a conclusion to the contrary.
 
 II.
 
 22
 As an alternative theory, Pink Supply alleges a conspiracy between Dayton's and Hiebert or between Dayton's and the combined entity of Hiebert and the representatives. The district court found insufficient admissible evidence that these actors combined to procure appellant's termination so as to fix prices in Hiebert furniture. Pink Supply, supra, 612 F.Supp. at 1342-47. Appellant objects to the district court's refusal to consider certain hearsay and double hearsay statements as evidence of conspiracy. Id. at 1344-47. We have reviewed the district court's evidentiary rulings and find no error.
 
 
 23
 Without a showing that admissible evidence will be available at trial, a party may not rely on inadmissible hearsay in opposing a motion for summary judgment. Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir.1985) and cases cited therein. Evidence of dealer complaints about the price-cutting practices of a competing dealer, followed by termination of the competitor, provides insufficient proof of antitrust conspiracy. Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 763-64, 104 S.Ct. 1464, 1470-71, 79 L.Ed.2d 775 (1984). In the absence of other independent evidence establishing the existence of a conspiracy, appellant's reliance on FED.R.EVID. 801(d)(2)(E) as the basis for admission of alleged coconspirator statements is misplaced. See World of Sleep, Inc. v. La-Z-Boy Chair Co., 756 F.2d 1467, 1474 (10th Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985). In addition, we find no error in the district court's conclusion that one of the statements failed to qualify as a declaration against interest, FED.R.EVID. 804(b)(3), and that all lacked sufficient indicia of trustworthiness to warrant their introduction under the discretionary exceptions to the hearsay rule, FED.R.EVID. 803(24) and 804(b)(5).
 
 
 24
 While summary judgment is to be used sparingly in antitrust litigation, it is appropriate when, as in this case, the nonmoving party is unable to establish a genuine issue of material fact on which to proceed to trial. Domed Stadium Hotel, Inc. v. Holiday Inns, Inc., 732 F.2d 480, 486 (5th Cir.1984); Transource International, Inc. v. Trinity Industries, Inc., 725 F.2d 274, 279 (5th Cir.1984). Accordingly the judgment of the district court is affirmed.[6]
 
 
 
 [1]
 The Honorable Harry H. MacLaughlin, United States District Judge for the District of Minnesota
 
 
 [2]
 Pink Supply Corp. v. Hiebert, Inc., 612 F.Supp. 1334 (D.Minn.1985)
 
 
 [3]
 Under section 1 of the Sherman Act, a "contract, combination * * * or conspiracy, in restraint of trade * * * is declared to be illegal." 15 U.S.C. Sec. 1 (1982)
 
 
 [4]
 The agent in Victorian House operated two retail stores in direct competition with the retailer whose termination he procured, and the agent therefore had a direct economic stake in the competitor's termination. Victorian House, Inc. v. Fisher Camuto Corp., 769 F.2d 466, 468-69 (8th Cir.1985)
 
 
 [5]
 The district court analyzed Albrecht and International Travel, harmonizing those decisions with Morton Buildings and Green as follows:
 In International Travel Arrangers and Albrecht, the principals engaged the agents for relatively discrete tasks (i.e. advertising, soliciting customers). By contrast, the Morton Buildings court refers to agents and employees in the same breath, indicating that the agents were quite similar to employees. Thus, the Court concludes that when agents resemble employees, the Morton Buildings rule should apply, but where agents are retained for more discrete tasks (e.g. retaining an advertising agency), the International Travel Arrangers rule is appropriate.
 Pink Supply, supra, 612 F.Supp. at 1339. While we do not adopt this approach as a general rule to govern all cases in which a principal and agent are alleged to have engaged in an antitrust conspiracy, the question of "discrete tasks" may be relevant to their capacity to conspire. The nature of the relationship between principal and agent and the purpose for which an agent has been employed are circumstances relevant to whether the entities are sufficiently distinct in terms of economic interest to be able to combine as coconspirators within the meaning of the Sherman Act.
 
 
 [6]
 With respect to the cross-appeal, we find no abuse of discretion in the district court's decision against retaining jurisdiction over Hiebert's pendant state law counterclaim after the entry of summary judgment on appellant's claims