The F.B. LEOPOLD CO., INC., Plaintiff,

v.

ROBERTS FILTER MANUFACTURING COMPANY, INC., Defendant.

Civ. A. No. 92–2427.

United States District Court,
W.D. Pennsylvania.

March 10, 1995.

434

Webb, Burden, Ziesenheim & Webb, P.C., John W. McIlvaine, III, Pietragallo, Bosick & Gordon, John E. Hall, Pittsburgh, PA, for plaintiff.

Feldstein, Grinberg, Stein & McKee, Stanley M. Stein, Dickie, McCamey & Chilcote, P.C., Leland P. Schermer, Pittsburgh, PA, for defendant.

## OPINION AND ORDER OF COURT

AMBROSE, District Judge.

Pending before the Court are two Motions for Summary Judgment filed by Plaintiff, The F.B. Leopold Co. [hereinafter Leopold], pursuant to Fed.R.Civ.P. 56. Leopold initiated this patent infringement action on December 18, 1992. Defendant, Roberts Filter Manufacturing Company [hereinafter Roberts Filter], has filed a counterclaim for declaratory judgment of invalidity and noninfringement of Leopold's patents, and has also asserted claims under § 43(a) of the Lanham Act, as well as claims which seek relief for unfair competition, anti-trust, and defamation. The instant Motions for Summary Judgment concern Roberts Filter's counterclaims for anti-trust and defamation. Oral argument on these motions was held on February 17, 1995. For the reasons set forth below, Leopold's Motion for Summary Judgment as to Defendant's Defamation Counterclaim will be granted in part and denied in part. Leopold's Motion for Summary Judgment as to Defendant's Antitrust Counterclaim will be granted.

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548,

2552, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, this Court must examine the facts in a light most favorable to the party opposing the motion. International Raw Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir.1987). The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is material when it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex, 477 U.S. at 322, 106 S.Ct. at 2552.

Because the facts have been set forth (extensively) in the parties' briefs[1], and this action has been the subject of various motions previously addressed by this Court, we need only briefly summarize the nature of this action here. The claims which are the subject of this suit primarily are the result of the efforts of Leopold and Roberts Filter to secure a bid on a public contract to supply filtration equipment for the City of Reading's Maiden Creek Filter Plant Filter Rehabilitation Project. Leopold and Roberts Filter are competitors in the water filtration business.

In December, 1989, the City of Reading began preparing a rehabilitation project for its Maiden Creek Filtration Plant. The City of Reading worked on this project in conjunction with engineers from Entech, Inc. and BCM. Leopold sales representatives corresponded with the engineers concerning the

1. Leopold has filed a brief in support of each of its motions and a succinct reply brief. Roberts Filter has filed a single, one hundred and ten (110) page brief in opposition to Leopold's motions. After oral argument, Leopold filed an Outline of Leopold's Argument in Support of Summary Judgment on the Anti-trust Claims and

Roberts Filter filed a Supplemental Memorandum in Reply to Matters Raised by Leopold for the First Time at Oral Argument, a Supplemental Memorandum in Opposition to Leopold's Motion for Summary Judgment on Anti-trust Counterclaims, and a Reply Outline in Opposition to Summary Judgment on Anti-trust Claims.

use of the Leopold IMS plate and media for the project. (See Volume I of Roberts Filter's Exhibits, Exhibit 31) During this time, Leopold was pursuing a patent for its "Cap for Underdrains in Gravity Filters." (See Volume I of Roberts Filter's Exhibits, Exhibits 34, 35) The patent was eventually issued on September 22, 1992, and is referred to by the parties as the "427 patent." [2] (See Volume I of Roberts Filter's Exhibits, Exhibit 39) The patented product essentially consists of a Leopold underdrain and a porous plate (the "IMS Cap").[3] (Leopold's Exhibits (Antitrust), Exhibit 5; see also Leopold's Exhibits (Defamation), Exhibit 10)

Leopold was designated as the basis of the design for the Maiden Creek Filter Rehabilitation Project. (Leopold's Exhibits (Antitrust), Exhibit 8, p. 1) Roberts Filter also sought to bid on the project. (See Volume I of Roberts Filter's Exhibits, Exhibits 32, 38, 56) Roberts was eventually added as an acceptable alternative supplier for the project. (Volume I of Roberts Filter's Exhibits, Exhibits 44, 62)

A series of meetings and an exchange of correspondence then ensued concerning Leopold's assertion that the design proposed by Roberts Filter for the project would infringe on Leopold's 427 patent. (See e.g. Volume I of Roberts Filter's Exhibits, Exhibits 45, 49, 53, 55, 58, 60, 63, 64) The bidding for the project was initially set for November 18, 1992, but was postponed so that additional tests could be conducted on the proposed designs. (Volume I of Roberts Filter's Exhibits, Exhibit 62, p. 2) On December 18, 1992, Leopold filed the instant action alleging, *inter alia*, that a demonstration conducted by Roberts Filter at the Godwin Pump facility in New Jersey infringed on Leopold's patent. At the December 29, 1992, pre-counsel meeting of the Reading City Counsel, it was decided that all bids on the filtration contracts would be rejected and the bidding was again postponed. (Volume I of Roberts Filter's Exhibits, Exhibit 62, p. 5; see also

Leopold's Exhibits (Antitrust), Exhibit 17) Ultimately, Leopold was unable to bid on the City of Reading project and Roberts Filter was awarded the contract. (Volume I of Roberts Filter's Exhibits, Exhibit 68)

We will first address Leopold's Motion for Summary Judgment with respect to Defendant's counterclaim for defamation. Leopold contends that summary judgment should be granted in its favor for a number of reasons. Specifically, Leopold argues that it was either absolutely or conditionally privileged to publish the alleged defamatory statements and asserts various theories in support of these privileges. Leopold also claims that the statements that are the subject of this action are not defamatory and that Roberts Filter has failed to come forward with sufficient evidence to establish damage to the reputation or, to the extent that Roberts Filter has attempted to assert a claim for commercial disparagement, no pecuniary loss has been shown.

The following has been identified by Roberts Filter as the subject of the defamation claim:

(a) That ·on or about October 21, 1992, Leopold, by and though its President and CEO, Marvin A. Brown, sent a letter to the Purchasing Agent of the City of Reading in which letter Brown accused Roberts of knowingly infringing the Leopold patent; copies of that letter were sent to various other persons; Leopold supplemented that letter with verbal communications to agents of the City of Reading, including Russell Smith, Reading's project engineer (Paras. 1–4, Seconded Amended Count V);

(b) That in early October, 1992, employees of Leopold met with Russell Smith and, by means of oral communication and through the exhibition of a device which falsely purported to be a sample of the Roberts' product, disparaged Roberts' product, suggesting that it was of flimsy construction

---

**2.** The second patent at issue is also à patent for "Cap for Underdrains in Gravity Filters." This patent is numbered 5,232,592 and is referred to by the parties as the "592 patent." (See Volume II of Roberts Filter's Exhibits, Exhibit 115)

**3.** IMS (Integral Media Support System) "consists of a molded high molecular weight, high density polyethelen [sic] cap designed to fit over the universal underdrain block." (See Leopold's Exhibits (Antitrust), Exhibit 31, p. 2)

and would not perform the functions that it was designed to perform. (Id., Paras. 8 and 9) (Bareis, pp. 29–44, Ex. 88; Smith, pp. 144–145, Ex. 89);

(c) That on or about February 17, 1993, James Lefever, a sales representative of Leopold, with Leopold's full knowledge, approval and cooperation, appeared before a meeting of Reading City Council and further accused Roberts of knowingly infringing Leopold (sic) patent and engaging in a conspiracy with city engineers to provide a product with which so infringed (Id., Para. 10) (Lefever, pp. 65070, Ex. 74, Ex. 75; ex. 97, pp. 6–7); and

(d) That on November 12, 1992, Leopold's Regional Sales Manager, Nelson Bareis, in a letter directed to Hazen & Sawyer, engineers on the Detroit project, accused Roberts of designing a product which would infringe the Leopold patent and requested that Roberts be eliminated as an acceptable supplier (Id., Para 12) (Ex. 55).

Roberts Filter's Brief in Opposition to Summary Judgment, pp. 100–101.

In Pennsylvania, actions for defamation are governed by 42 Pa.Cons.Stat.Ann. § 8343 which provides:

(a) Burden of Plaintiff.—In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

(b) Burden of defendant.

(1) The truth of the defamatory communication.

(2) The privileged character of the occasion on which it was published.

(3) The character of the subject matter of defamatory comment as of public concern.

42 Pa.Cons.Stat.Ann. § 8343 (1982).

■ Additionally, we would note that although Count V of Roberts Filter's Second Amended Complaint is entitled "Defamation," the allegations have also been construed by the parties as commercial disparagement. In order to maintain an action for commercial disparagement, the plaintiff must prove that the disparaging statement of fact is untrue or that the disparaging statement of opinion is incorrect; that no privilege attaches to the statement; and that the plaintiff suffered a direct pecuniary loss as the result of the disparagement. *U.S. Healthcare Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 924 (3d Cir.1990). "A commercially disparaging statement ... is one which is intended by its publisher to be understood or which is reasonably understood to cast doubt upon the existence or extent of another's property in land, chattels or intangible things, or upon their quality, ... if the matter is so understood by its recipient." *Id.* (internal quotations omitted)

■ Leopold first argues that it had an absolute privilege to publish the alleged defamatory statements because the statements "related to contemplated or actual judicial proceedings." (Leopold's Brief in Support of Summary Judgment (Defamation), p. 9) *See* Restatement (Second) of Torts § 587 (1977). This section of the Restatement provides, in relevant part, that:

A party to a private litigation ... is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding.

Restatement (Second) of Torts § 587 (1977). *See also* Restatement (Second) of Torts § 635 (1977) [applying § 587 to claims for commercial disparagement].

Pennsylvania has recognized an absolute privilege for communications in judicial pro-

ceedings. *See Post v. Mendel,* 510 Pa. 213, 507 A.2d 351 (1986), *Pawlowski v. Smorto,* 403 Pa.Super. 71, 588 A.2d 36 (1991). Although the alleged defamatory communications at issue in this action were not made during the course of a judicial proceeding, they may be "communications preliminary to a proposed judicial proceeding." Restatement (Second) of Torts, *supra.* Leopold is therefore required, in order to establish the applicability of the privilege, to demonstrate that "the protected communication[s] ... [were] pertinent and material and ... [were] issued in the regular course of preparing for contemplated proceedings." *Post,* 507 A.2d at 356. *See* 42 Pa.Cons.Stat.Ann. § 8343(b)(2).

Leopold cites *Pinto v. Internationale Set, Inc.,* 650 F.Supp. 306 (D.Minn.1986) and *Walker v. Majors,* 496 So.2d 726 (Ala.1986), in support of its position that the communications were absolutely privileged. In *Pinto,* the plaintiffs were former employees of the defendant who left their positions with the defendant company and began working for the defendant company's competitor. After the plaintiffs left the defendant company's employ, the defendant's counsel sent a letter dated January 2, 1986, to the plaintiffs' new employer which warned the plaintiffs' new employer that litigation would be instituted and accused the plaintiffs of unfair competition and conspiracy, fraud, misrepresentation, and other misdeeds. *Pinto* 650 F.Supp. at 307–308. Plaintiffs then filed suit against their former employer alleging, *inter alia,* defamation based on the January 2, 1986, letter. The court found that the communication was absolutely privileged because the letter "was written in anticipation of the March 1986 litigation, it concern[ed] the claims made in that litigation, it [sought] to dissuade plaintiff from further engaging in the alleged activities which gave rise to the litigation, and it was directed to plaintiffs and their new employer on defendant's behalf." *Id.* at 308–309.

In *Walker v. Majors,* 496 So.2d 726 (Ala. 1986), the plaintiff, a land owner, filed suit alleging defamation against a real estate agent after the real estate agent sent letters, and returned the earnest money, to two pro-

spective purchasers of the plaintiff's property. The letters included a paragraph which stated that the real estate agent was going to file suit against the land owners for breach of contract, and to recover damages incurred as a result of the land owners' fraudulent conduct. The court found that the letters were absolutely privileged because they were relevant to the contemplated judicial proceeding of the real estate agent.

Roberts Filter cites *Post v. Mendel,* supra, and argues that "the defamatory communications were not made in the regular course of judicial proceedings and were not pertinent and material to the redress or relief sought." (Brief of Roberts Filter, p. 102–103) In *Post,* the plaintiff and defendant were engaged as opposing counsel in litigation. During the trial, defendant Mendel wrote a letter to plaintiff Post concerning Mendel's irritation at Post's conduct during trial. The letter was copied to the judge hearing the ongoing case, the Disciplinary Board of the Supreme Court, and Mendel's client in the ongoing case. The trial court found the letter absolutely privileged because it was disclosed in connection with a judicial proceeding. The Pennsylvania Supreme Court reversed, holding that the communication was not protected by an absolute privilege.

In reaching its decision, the Court emphasized the importance of applying the privilege in accordance with its underlying policy and stated, "we do not believe issuance of the letter was within the sphere of activities which judicial immunity was designed to protect." *Post,* at 355, 356. The Court reasoned that the challenged communication must bear a certain relationship to the proceedings in order to qualify as privileged. *Id.* The Court then found that the letter contained matter which was not relevant to the judicial proceedings and that it was published to persons who had no direct interest in the proceedings. *Id.* at 357. Thus, unlike *Pinto* and *Walker,* the letter in *Post* did not "relate to the adjudication of the claims at issue in [the] proceedings." *Pawlowski,* 588 A.2d at 41.

In the case at bar, we are unable to find that any of the communications at issue were relevant to the judicial proceedings initiated

by Leopold on December 18, 1992. Under *Post,* imminent or ongoing litigation between the parties is insufficient to bring every matter that transpires between the parties within an absolute privilege. Furthermore, Leopold has not explained how any of the communications related to the adjudication of the claims at issue in the proceedings. Moreover, it is not clear that all of the various parties to whom the communications were made had a direct interest in the proceedings. *Post,* 507 A.2d at 357, *Pawlowski,* 588 A.2d at 42. We find that the alleged defamatory statements are not protected by the absolute privilege for judicial proceedings.

■ We next address Leopold's argument that it is entitled to summary judgment because it is protected, pursuant to Restatement (Second) of Torts § 592A,[4] by an absolute privilege to publish defamatory matter that it was required, by law, to publish. (See Leopold's Memorandum in Support of Summary Judgment (Defamation), p. 11). Leopold argues that the patent laws require a patent holder to notify a potential infringer before the patent holder may recover damages for infringement. Apparently, Leopold relies upon 35 U.S.C. § 287. This section provides, in relevant part:

> § 287. Limitation on damages and other remedies; marking and notice
>
> (a) Patentees, and persons making or selling any patented article for or under them, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or when from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. *In the event of failure so to mark,* no damages shall be recovered by the paten-

tee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

35 U.S.C.A. § 287(a) (West Supp.1994) (emphasis added).

Leopold has not presented any authority which would indicate that this section invokes an absolute privilege. We need not decide that issue, however, because Leopold has not demonstrated that it was required under section 287 to publish the alleged defamatory communications. Specifically, Leopold has not argued that its product was not properly marked. Under section 287, "[t]wo kinds of notice are specified—one to the public by visible mark, another by actual advice to the infringer. The second becomes necessary only when the first has not been given." *Ceeco Mach. Mfg. Ltd. v. Intercole, Inc.,* 817 F.Supp. 979, 982 (D.Mass.1992). Since there is no allegation that Leopold's product was not properly marked, there is no apparent need to invoke section 287(a). We therefore find Leopold's argument to be without merit.

Leopold also argues that it was conditionally privileged to make the communications at issue because (1) Roberts Filter and Leopold were rival claimants and, (2) the communications directly related to matters of public concern.[5] Roberts Filter argues that with respect to these conditional privileges, there are genuine issues of material fact concerning Leopold's alleged bad faith which preclude the entry of summary judgment on these conditional privileges.

We will first address the rival claimant privilege. Under this theory, Leopold in-

---

4. This section provides:

> One who is required by law to publish defamatory matter is absolutely privileged to publish it.
>
> Restatement (Second) of Torts § 592A (1977).

5. In support of the public concern argument, Leopold directs the Court to the Restatement (Second) of Torts § 598. This section provides:

> An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
> (a) there is information that affects a sufficiently important public interest, and
> (b) the public interest requires the communication of the defamatory matter to a public officer or a private citizen who is authorized or privileged to take action if the defamatory matter is true.
>
> Restatement of Torts (Second) § 598 (1977).

vokes the Restatement (Second) of Torts § 647. This section provides:

A rival claimant is conditionally privi-·leged to disparage another's property in land, chattels or intangible things by an assertion of an inconsistent legally protected interest in himself.

Comment (d): Belief in validity of claim. ... Under the rule stated in this Section a rival claimant is privileged to assert the inconsistent interest unless a trier of fact is persuaded that he did not believe in the possible validity of his claim. It is not necessary that the person asserting the claim should believe in its certain or even probable validity. It is enough if he believes in good faith that there is a substantial chance of its being sustained.

Restatement of Torts (Second) § 647 (1977).

 It is the burden of Leopold to establish that the rival claimant privilege attaches to each of the communications. 42 Pa.Cons.Stat.Ann. § 8343(b)(2). A patent holder may assert this privilege when the patent holder has claimed in good faith that a party has infringed its patent. *See e.g. Kemart Corp. v. Printing Arts Research Lab., Inc.,* 269 F.2d 375, 391 (9th Cir.1959), *Oil Conservation Eng'g Co. v. Brooks Eng'g Co.,* 52 F.2d 783, 785–787 (6th Cir.1931). We find that Leopold has met its burden in establishing that the rival claimant privilege applies to the communications which concern Roberts Filter's alleged infringement of the Leopold patent. (See Robert Filter's Brief, pp. 100–101, (a), (c) & (d))

 We must next address whether Roberts Filter has met its burden in setting forth facts of record from which a reasonable jury may find that Leopold abused this conditional privilege. *See* 42 Pa.Cons.Stat.Ann. § 8343(a)(7). We are not concerned with assessing whether the publishers of the alleged defamatory material were correct in their assertion that Roberts Filter infringed the Leopold patent; rather, we focus on whether the publishers had reasonable cause to believe that the assertion of patent infringement was true. *Kemart* at 391 fn 10, and 393. *See also Forman v. Cheltenham Nat. Bank,* 348 Pa.Super. 559, 502 A.2d 686,

688 (1985) (publisher must reasonably believe in the validity of the claim), *Fischer v. Bar Harbor Banking & Trust Co.,* 673 F.Supp. 622 (D.Me.1987), aff'd, 857 F.2d 4 (1st Cir. 1988) ("Plaintiff has the burden of showing that the [defendant] did not have a good faith belief in the 'possible·validity of [its] claim' ... but rather that it acted in knowing or reckless disregard of the truth." *Id.,* 673 F.Supp. at 626.). *But see, Forman,* 502 A.2d at 689 (Beck, J., concurring) (The question is not whether the person asserting the claim should believe in its certain or even probable validity, but rather whether the claimant believes in good faith, both when the rival property claim was initially asserted and when the claimant thereafter continued to maintain the claim, that there was a substantial chance of having the claim upheld.)

Roberts Filter argues in its brief that it has set forth sufficient facts of record from which a reasonable jury could find that Leopold acted in bad faith. In particular, Roberts Filter argues that "a jury could easily conclude that Leopold, even though it *may* have viewed its patent as valid ... knew very well that Roberts had not infringed it." (Roberts Filter's Brief at 103) (emphasis in original) Roberts Filter further asserts that "[i]f Leopold knew, as the fair inference to be drawn from the evidence suggests it did, that [Roberts Filter] did not infringe its patent, then its defamatory or disparaging communications accusing Roberts of infringing cannot have been made in good faith." (Roberts Filter's Brief at 103)

We begin by analyzing each of the alleged defamatory communications. The first alleged defamatory communication is an October 21, 1992, letter written by Leopold President and CEO Marvin Brown to Maria Ballas (apparently a Reading city official) which states:

I understand that you intend to publish an addendum for the subject project that will allow Roberts Filter to provide an alternative to the Leopold Universal Underdrain with IMS Cap; a Clay Underdrain Block with an IMS Cap. We believe that the Roberts design will infringe on our patent. Unfortunately, any legal action must first be levied against the end-user of the in-

fringed product, not the manufacturer; thus the need to notify you of the potential infringement.

Volume I of Robert Filter's Exhibits, Exhibit 45.

Roberts Filter argues that evidence has been produced concerning Mr. Brown's knowledge of the validity of his claim which precludes the entry of summary judgment. Specifically, Roberts Filter argued at oral argument that Brown knew that Leopold attorney John McIlvaine had filed a continuation application on the 427 patent which was designed to cover the proposed design of Roberts Filter for a project that both Roberts Filter and Leopold were bidding on in Detroit. (See also Roberts Filter's Brief at 16) Roberts Filter also argues in its Supplemental Memorandum that with respect to Roberts Filter's proposed design for the City of Reading project, there is evidence which indicates that Leopold did not even know what the Roberts Filter design was when Marvin Brown sent the letter to the City of Reading. (See Roberts Filter's Supplemental Memorandum at 3–4) Roberts Filter concludes that a reasonable jury could find that Brown knew that Roberts Filter's proposed design did not infringe on the 427 patent as alleged.

At his deposition, Marvin Brown stated the following:

Q: Now, the document says, "We believe the Roberts design will infringe on our patent." Why did you believe that on October 21, 1992?

A: Because its very difficult to imagine any design where you affix a porous plate to the top of the lateral underdrain without infringing.

Deposition of Marvin Brown June 28, 1993, p. 150, Exhibit G to Exhibits in Support of Submission of Defendant on Disqualification Issues.

Although this statement by Brown may indicate a reasonable belief in the validity of the claim, there is also evidence of record that indicates that Brown may have known that the continuation application filed by Leopold was filed to cover Roberts Filter's design. For example, a letter dated February 5, 1993, to Attorney John McIlvaine from Marvin Brown states:

2) Application 07/947,145 dated 9/18/92. As I recall, this is an expansion of patent 5,149,427 on porous plastic IMS to cover Roberts' recent design plus.

Exhibits in Support of Submission of Defendant on Disqualification Issues, Exhibit 262 E.

Additionally, the record contains a letter from Attorney John McIlvaine to Gene Bergmann, Vice President of Engineering at Leopold, wherein McIlvaine advises Bergmann on September 18, 1992, that the continuation application had been filed with the United States Patent and Trademark Office. The letter indicates that a copy of this letter was sent to Marvin Brown. (Volume I of Roberts Filter's Exhibits, Exhibit 41) Brown may therefore have been aware of the continuation application [6] as early as September 18, 1992.

Additionally, Roberts Filter directs this Court to Marvin Brown's declaration in the Petition to Make Special Because of Actual Infringement that "the device which I allege infringes this invention was first discovered to exist on November 5, 1992." (Volume II of Roberts Filter's Exhibits, Exhibit 115, p. 72) This creates a genuine issue of material fact as to whether Brown in good faith believed on October 21, 1992, that "Roberts design will infringe on our patent." (Volume I of Roberts Filter's Exhibits, Exhibit 45)

Based on the evidence of record we find that there are genuine issues of material fact concerning whether Brown had reasonable

---

6. McIlvaine stated during his deposition:

Q: Does this document help refresh your recollection that Leopold's [sic] specifically was attempting to make the 592 Patent cover Roberts' design?

A: I would agree to the extent that both myself and Leopold were conscious at the time of the fact that the claims which we were pursuing would, in addition to the 427 Patent, cover the Roberts' design.

Deposition of John McIlvaine, August 20, 1993, p. 314, Volume II of Roberts Filter's Exhibits, Exhibit 111.

cause to believe that the assertion of patent infringement was true. Summary judgment cannot be granted as to this claim.

■ We next turn to the February 17, 1993, meeting of the Reading City Council. At this meeting, Leopold sales representative James Lefever appeared on behalf of Leopold and made a presentation. During this presentation, which has been transcribed, Lefever stated:

Roberts also said they could meet all the specs and also supply an IMS cap even though they knew they would be infringing upon several enforceable Leopold patents, which we are now in litigation with Roberts on.

Volume I of Roberts Filter's Exhibits, Exhibit 97.

While Roberts Filter has alleged bad faith on the part of Leopold, it bases its claims of bad faith mainly on the actions of Attorney John McIlvaine who prosecuted the patents at issue for Leopold. Roberts Filter has directed this Court to no evidence which would tend to demonstrate that *James Lefever*, the publisher of the alleged defamatory material, did not have a "reasonable belief in the validity of [his] claim." *Forman*, 502 A.2d at 688. Absent such evidence, we find that Roberts Filter has failed to come forward with sufficient evidence from which a reasonable jury may find that the rival claimant privilege was abused with respect to this communication.

Similarly, Roberts Filter claims that a November 12, 1992, letter from Nelson Bareis, Leopold's Regional Sales Manager, was defamatory. The letter states in relevant part:

We believe that Roberts' design will infringe on our patent. Therefore, to prevent potential patent infringement litigation, we recommend that Roberts be removed as an acceptable supplier.

Volume I of Roberts Filter's Exhibits, Exhibit 55, p. 2.

Roberts Filter has not argued that Nelson Bareis made these statements in bad faith. We therefore find that Roberts Filter has failed to meet its burden of producing sufficient evidence from which a reasonable jury may find that Leopold abused its privilege

with respect to this communication. Additionally, we find that Roberts Filter has failed to come forward with sufficient evidence to demonstrate that the privilege was abused due to overpublication with respect to either the Bareis or Lefever communications. *See generally, Elia v. Erie Ins. Exch.*, 430 Pa.Super. 384, 634 A.2d 657, 661 (1993) ("Abuse of a conditional privilege is indicated when the publication ... is made to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege ...").

■ Roberts Filter's final claim of defamation involves a meeting in early October, 1992, during which employees of Leopold allegedly:

... by means of oral communication and through the exhibition of a device which falsely purported to be a sample of the Roberts' product, disparaged Roberts' product, suggesting that it was of flimsy construction and would not perform the functions that it was designed to perform. (Id., Paras. 8 and 9) (Bareis, pp. 29–44, Ex. 88; Smith, pp. 144–145, Ex. 89);

Roberts Filter's Brief, p. 100.

We have already determined that the rival claimant privilege does not apply to this communication. We nevertheless must grant summary judgment as to this claim because we find the claim insufficient as either a claim for defamation or a claim for commercial disparagement as a matter of law.

We would initially note that this claim does not appear to be a claim for defamation because a defamatory statement is one which "tends ... to harm the reputation of [Roberts Filter] as to lower [it] in the estimation of the community or to deter third persons from associating or dealing with [it]." *U.S. Healthcare*, 898 F.2d at 923. Rather, the claim appears to be that of commercial disparagement. The Third Circuit has stated:

The distinction between actions for defamation and disparagement turns on the harm towards which each is directed. An action for commercial disparagement is meant to compensate a vendor for pecuniary loss suffered because statements attacking the quality of his goods have re-

duced their marketability, while defamation is meant [to] protect an entity's interest in character and reputation.

*Id.* at 924.

In determining whether a statement is defamatory or commercially disparaging, the Third Circuit has utilized the following test:

> [W]here the publication on its face is directed against the goods or product of a corporate vendor or manufacturer, it will not be held libelous per se as to the corporation, unless by fair construction and without the aid of extrinsic evidence it imputes to the corporation fraud, deceit, dishonesty, or reprehensible conduct in its business in relation to said goods or product.

*Id.*, citing *National Ref. Co. v. Benzo Gas Motor Fuel Co.*, 20 F.2d 763, 771 (8th Cir. 1927).

When the allegations of Roberts Filter concerning the October, 1992, meeting between Leopold employees and Russell Smith are analyzed under this test, they clearly do not impute to Roberts Filter "fraud, deceit, dishonesty, or reprehensible conduct in its business." *Id.* The allegations are actionable (if at all) under a cause of action for commercial disparagement.

■ With respect to the specific communication, Roberts Filter cites to the depositions of Nelson Bareis and Russell Smith to demonstrate publication of the defamatory matter. A review of these depositions does not reveal the identity of the person who communicated the alleged disparaging matter, nor do the depositions reveal what disparaging words were spoken. The most specific description of the meeting was given by Russell Smith during his deposition where he stated:

> Just as a comment, originally in one of the meetings that I had with Jim Lefever, Nelson Bareis was also present. They brought in a Leopold clay tile. Leopold had manufactured the same type of tile as

Roberts prior to switching to the universal underdrain. Attached to that clay tile with steel banding straps was a piece of plate. The porous plate was approximately 5/8th of an inch thick and the steel bands were approximately 18 inches a part [sic]. When they brought this unit into the office, they are saying this is what Roberts is proposing to furnish to you. Look how flimsy this porous plate is and they grabbed the center of the porous plate and lifted it and there was a lot of flexibility in that porous plate.

Deposition of Russell Smith February 9, 1993, p. 144, Volume I of Roberts Filter's Exhibits, Exhibit 89

Roberts Filter has not directed this Court to any evidence that would indicate that either of the two Leopold representatives at the meeting stated that the plate was flimsy or that either of them made any other disparaging comments about the product. We find that Roberts Filter has failed to establish the existence of a disparaging communication with respect to this claim. Summary judgment with respect to this claim will therefore be granted.[7]

Based on our disposition of Leopold's Motion for Summary Judgment (Defamation), we need not address Leopold's remaining arguments.

We next address Leopold's Motion for Summary Judgment on Roberts Filter's anti-trust claims. Roberts Filter summarily alleges in its five paragraph anti-trust counter-claim that "[t]he conduct of Plaintiff ... violates the provisions of the Sherman Anti-trust Act, 15 U.S.C. §§ 1 and 2, and otherwise constitute [sic] unfair and predatory competition." (Roberts Filter's Second Amended Answer and Counterclaim, ¶ 27) In its Brief in Opposition to Summary Judgment, Roberts Filter claims that it has stated viable anti-trust claims for monopolization and illegal tying under section 1 of the Sherman Act, attempted monopolization under section 2 of the Sherman Act, and a *Walker*

---

7. This disposition does not preclude Roberts Filter from pursuing Count II of its Counterclaim

under section 43(a) of the Lanham Act.

*Process*[8] claim for fraudulent procurement and bad faith enforcement of a patent.

Leopold sets forth numerous reasons why summary judgment should be granted as to all anti-trust claims averred by Roberts Filter. For example, Leopold argues that with respect to the section 1 claim, Roberts Filter has not shown concerted activity, nor has it established all the elements necessary to establish an illegal tying arrangement. Leopold also argues that with respect to the section 2 claims, Roberts Filter cannot demonstrate a monopoly, a specific intent to achieve a monopoly or predatory and anti-competitive conduct. Moreover, Leopold argues, Roberts Filter has not come forward with sufficient evidence to demonstrate that Leopold has sufficient market power to come dangerously close to achieving a monopoly, and has failed to define a relevant product market. Finally, Leopold argues that the *Walker Process* claim must be dismissed because all of the prerequisites to a section 2 claim have not been met, and that sufficient evidence of fraud has not been produced.

Section 1 of the Sherman Act provides, in relevant part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C.A. § 1 (West Supp.1994).

■ To establish a claim under section 1 of the Sherman Act, a plaintiff must show (1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to the contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of the conspiracy. *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 856 F.Supp. 990, 995–996 (E.D.Pa.1994). "The very essence of a section 1 claim . . . is the existence of an agreement. Indeed, section 1 liability is predicated upon some form of concerted

action." *Alvord–Polk Inc. v. F. Schumacher & Co.,* 37 F.3d 996, 999 (3d Cir.1994), *cert. denied,* —— U.S. ——, ——, 115 S.Ct. 1691, 131 L.Ed.2d 556 (1995). "The term 'concerted action' is often used as a shorthand for any form of activity meeting the section 1 'contract, combination or conspiracy.'" *Id.* at 999 fn. 1.

Leopold argues that Roberts Filter has failed to demonstrate concerted action. Roberts Filter attempts to establish concerted action by stating that "Leopold acted in concert with Attorney McIlvaine, and with independent sales representatives so as to achieve the unlawful purpose of 'restraining trade.'" (Roberts Filter's Brief at 26) We find that Roberts Filter has failed to establish concerted action.

In reaching this conclusion, we would initially note that the Third Circuit has recognized that concerted action has been treated by Congress more strictly than unilateral behavior because "[c]oncerted activity inherently is fraught with anticompetitive risk . . . In any conspiracy, *two or more entities that previously pursued their own interests separately* are combining to act as one for their common benefit." *Id.* at 1000, citing *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768–69, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984) (emphasis added). Importantly, "[i]t is the joining together of formerly competitive interests which implicates the antitrust laws." *Siegel Transfer,* 856 F.Supp. at 999. In order to find concerted action in the case at bar, we must find that Leopold's patent attorney and its independent sales representatives "are legally capable of conspiring with each other under § 1 of the Sherman Act." *Copperweld,* 467 U.S. at 755, 104 S.Ct. at 2733.

■ The actors which allegedly conspired, according to Roberts Filter, were Leopold's independent sales representatives and the attorney who was acting on behalf of Leopold in prosecuting the 427 and 592 pat-

---

**8.** *Walker Process Equipment, Inc. v. Food Machinery and Chemical Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

ents.[9]. While Roberts Filter sets forth very little information about the duties of the independent sales representatives, the evidence of record at least reveals that the independent sales representatives accompanied Leopold employees to meetings, appeared before the Reading City Counsel to promote the Leopold design, and wrote letters which *inter alia,* recommended the use of Leopold products. (Roberts Filter's Brief, pp. 14, 29–30) Both Roberts Filter and Leopold utilized the services of independent sales representatives. (See Roberts Filter's Brief, p. 13, 14)

Whether or not concerted activity existed between a corporation and its independent sales representatives was addressed by the Eighth Circuit in *Pink Supply Corp. v. Hiebert, Inc.,* 788 F.2d 1313 (8th Cir.1986). In *Hiebert,* the plaintiff filed an antitrust suit alleging price-fixing and boycott conspiracy against Hiebert and four sales representatives who were employed by different companies. *Id.* at 1315. The independent sales representatives were responsible for assisting Hiebert in the solicitation of business and the promotion of Hiebert products, but represented other manufacturers besides Hiebert. *Id.* at 1316–1317. *See also Pink Supply Corp. v. Hiebert, Inc.,* 612 F.Supp. 1334, 1336–1338 (D.Minn.1985). The trial court granted summary judgment on the section 1 claim and found that based on the facts of record, Hiebert could not have conspired with its independent sales representatives. *Id.* at 1340.

The Eighth Circuit affirmed the trial court's decision to grant summary judgment. Relying on, *inter alia,* the rationale of the Supreme Court in *Copperweld,* the Eighth Circuit concluded that "the sales agents were so closely intertwined in economic interest and purpose with Hiebert as to amount to a unified economic consciousness incapable of conspiring with itself." *Hiebert,* 788 F.2d at 1317. The court particularly noted that the "sole function [of the sales representatives] in the context of Hiebert's organization was to generate business by persuading potential customers to select the Hiebert line." *Id.* at 1316. The court further stated that the sales representatives "served no purpose other than the promotion of products on behalf of Hiebert and other represented manufacturers." *Id.* at 1317.

We find *Hiebert* persuasive. Like the sales representatives in *Hiebert,* Leopold's independent sales representatives appear to "closely resemble employees" in their duties. *Hiebert,* 612 F.Supp. at 1340. Roberts Filter has not produced any evidence to the contrary. Rather, counsel for Roberts Filter attempted at oral argument to establish concerted action by asserting that the independent sales representatives have independent interests, presumably the commissions they were to receive. (See also Roberts Filter's Brief at 31) We find this insufficient to establish a capacity to conspire. *See American Standard Life & Accident Ins. Co. v. U.R.L., Inc.,* 701 F.Supp. 527, 537, fn. 5 (M.D.Pa.1988) (summarily rejecting the plaintiff's argument that the defendant insurance agents' interest in commissions sufficiently separated their goals from that of the defendant corporation to permit the conclusion that the agents could conspire with their own employing insurance agency), *see also Hiebert,* 788 F.2d at 1317 ("Substance, not form, should determine whether a separately incorporated entity is capable of conspiring under § 1").

Roberts Filter cites *Tamaron Distrib. Corp. v. Weiner,* 418 F.2d 137 (7th Cir.1969) in support of its position that independent manufacturer representatives can be separate actors for the purpose of a section 1 violation. The *Tamaron* court, however, in reaching its holding relied upon a Supreme Court case which held that when corporations "avail themselves of the privilege of doing business through separate corporations, the fact of common ownership could not save them from any of the obligations that the law imposes on separate entities." *Id.* at 139. This premise was rejected by the Supreme Court's decision in *Copperweld. Tamaron* is therefore not persuasive. *See Hiebert,* 612 F.Supp. at 1339 (The holding of *Tamaron* has been cast into doubt in light of *Copperweld* ).

**9.** McIlvaine is also counsel of record in this case.

■ In support of its position that an attorney may be a separate individual with whom the client may engage in concerted action in violation of antitrust law, Roberts Filter cites *Tillamook Cheese & Dairy Ass'n v. Tillamook County Creamery Ass'n*, 358 F.2d 115 (9th Cir.1966) and *Brown v. Donco Enter., Inc.*, 783 F.2d 644 (6th Cir.1986). These cases do not support Roberts Filter's position, however. In *Tillamook* and *Brown*, the discussion concerning the potential liability of the lawyer concerned the potential liability for attempted monopolization under section 2 of the Sherman Act.

We find that Roberts Filter has failed to come forward with sufficient evidence to demonstrate that the conduct of Leopold, its independent sales representatives, and its patent attorney amounts to anything more than unilateral action. Summary judgment must therefore be granted with respect to the claim under section 1 of the Sherman Act.

We next address whether Roberts Filter has (1) established a relevant market and (2) has demonstrated that Leopold has sufficient market power to come dangerously close to achieving a monopoly.

Section 2 of the Sherman Act provides, in relevant part:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony ...

15 U.S.C.A. § 2 (West Supp.1994).

■ Roberts Filter argues in its brief that Leopold "has sufficient market power to pose a dangerous probability of achieving monopoly." (Roberts Filter's Brief at 36) To demonstrate attempted monopolization under section 2 of the Sherman Act, a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) the specific intent to monopolize and (3) that the defendant has a dangerous probability of achieving monopoly power. *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir.1994), citing *Spectrum Sports,*

*Inc. v. McQuillan*, —— U.S. ——, ——— ——, 113 S.Ct. 884, 890–891, 122 L.Ed.2d 247 (1993).

The specific determination of whether the "dangerous probability" requirement has been met "requires inquiry into the relevant product and geographic market and the defendant's economic power in that market." *Pastore*, 24 F.3d at 512, citing *Spectrum Sports*, —— U.S. at ——, 113 S.Ct. at 892. (internal citations omitted) Relevant product market has been defined as "those commodities reasonably interchangeable by consumers for the same purposes." *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir.1991), citing *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). Relevant geographic market has been defined as "the area in which a potential buyer may rationally look for the goods or services he or she seeks." *Tunis Bros.*, 952 F.2d at 726, citing *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n of Pa.*, 745 F.2d 248, 260 (3d Cir., 1984).

■ Once the plaintiff has met its burden of defining the relevant market, a court must then determine whether the plaintiff has demonstrated that "the defendants possessed sufficient market power to come dangerously close to success within the market." *Pastore*, 24 F.3d at 513, citing *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 197 (3d Cir.1992), and *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 112 (3d Cir.1992).

■ In analyzing whether Leopold possesses sufficient market power, we must review various factors which "include the strength of the competition, probable development of the industry, the barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer demand." *Pastore*, 24 F.3d at 513, citing *Barr Labs*, 978 F.2d at 112. A significant factor is whether Leopold possesses a "significant market share when it undertakes the challenged anticompetitive conduct." *Id.* Market share is significant, but not exclusive in determining market power. *Id.*

Roberts Filter alleges that "[i]n this instance, the relevant market geographically, is

the United States. It is a market comprised of municipalities and public authorities responsible for the construction and maintenance of filter plants." (Roberts Filter's Brief at 35) Roberts Filter further asserts that "[w]ith regard to the product, the market is the sale of underdrain filter block and porous plate for new construction and porous plate for rehabilitation." (Roberts Filter's Brief at 35; see also Roberts Filter's Reply Outline p. 5) In support of these assertions, Roberts Filter relies upon the deposition testimony of Marvin Brown, numerous letters written by Brown, and the affidavit of R. Lee Roberts, the CEO of Roberts Filter.

Specifically, Roberts Filter relies upon the following deposition testimony of Marvin Brown who was President and CEO of Leopold:

Q: When you refer to the F.B. Leopold Company as an industry and world leader, what do you mean; what did you have reference to?

A: Well, we have the largest share of market of water filter, water gravity filter installations in the United States.

Q: What is that share?

A: I can't give you a precise number, but probably something like 75 percent.

Q: And what market would that be?

A: The United States.

Q: In what; water filtration installations?

A: Yes.

Q: And would that also be true for underdrain products, or would your actual market share be higher?

A: No, that's probably underdrains that I'm referring to; it's the underdrains and related equipment in a filter.

Deposition of Marvin Brown, June 28, 1993, Volume I of Roberts Filter's Exhibits, Exhibit 79 p. 138–139.

Brown subsequently filed a notarized addendum to this deposition testimony dated August 10, 1993, which states:

I did not understand your question regarding Leopold's share of the market for water gravity filter installations. The 75% that I reference is my estimate of the number of jobs awarded to Leopold out of total jobs bid. Further investigation suggests that Leopold obtains roughly ⅔ of the filter underdrain jobs *on which it bids.*
Leopold's Exhibits (Antitrust), Exhibit 29, p. 3. (emphasis in original)

The letters written by Marvin Brown which are relied upon by Roberts Filter include statements such as "[w]e are the undisputed market share leader in filter underdrains in the USA and Canada," (Volume I of Roberts Filter's Exhibits, Exhibit 77), and, "[a]s you know, the F.B. Leopold Company is an industry and world leader in filtration systems." (Volume I of Roberts Filter's Exhibits, Exhibit 45)

Roberts Filter also relies upon the affidavit of R. Lee Roberts in support of its definition of the relevant market and Leopold's market share. R. Lee Roberts states that:

6. According to my in-depth knowledge and experience of [sic] the market for factory supplied underdrain systems for water filtration systems, Leopold and Roberts are the only significant providers of underdrain equipment.

7. Leopold clearly has the dominant market share (approximately 80 percent in the past two or three years) for underdrain systems. Roberts clearly had most of the remainder of the market. Any other providers, such as Infilco Degremont, EIMCO or General Filter had less significant market shares. In the market for porous plate/underdrain block systems, however, Leopold has 100%.

. . . . .

9. Roberts began to provide products and services for the underdrain systems market approximately 100 years ago.

10. Leopold began to provide products and services for the underdrain systems market approximately 70 years ago.

11. The market for filtration equipment exists primarily in the United States among several thousand municipalities and public authorities which own and operate water treatment facilities. Many of these facilities are old. Roberts supplied filtration equipment to Reading's Maiden Creek Filter Plant ("MCFP") in 1934, for example. Many need to be upgraded or ex-

panded because of recent changes in federal and state law regarding clean drinking water.

12. In addition to new construction, therefore, there is a significant market for rehabilitation. Many of the plants that will require rehabilitation were originally designed using Roberts Wheeler bottom or Roberts or Leopold's ceramic clock underdrain.

. . . . .

18. The potential for new installations of underdrain nationwide is approximately an average of 200,000 square feet per year, or more depending on the existence of some large 25–50,000 square feet projects.

19. At an average cost of $120–$150 per square foot, the total yearly market for filtration equipment will be between $25,-000,000 to $30,000,000. I estimate that approximately one-half of that will involve rehabilitation. About one-half will involve the separate market in porous plate systems. In many of the municipalities with older systems, there is a need to meet the new Federal and State water quality standards as well as increase the production of clean water for consumers. There are only a certain number of ways to do this. They can build new plants, build new expansions on old plants or rehabilitate old plants in such a manner as their production capabilities are increased. One of the methods available to rehabilitate an old filter bed and increase quality and production is to replace the 12 to 18″ of support gravel with something like a porous plate, thereby allowing for the use of more filter media. This is a method of quality and production increase which will interest a number of engineers and consumers.

Original Affidavit of R. Lee Roberts ¶ 7–19; see also Volume I of Roberts Filter's Exhibits, Exhibit 2.

Although Roberts Filter did not address the interchangeability of the identified product in its original brief, Roberts Filter argues in its Reply Outline that the underdrain filter system utilizing porous plate is "a unique product which is not reasonably interchangeable for the same purpose with any other identified product, especially when used to rehabilitate older shallow-bed filters ... [T]he porous plate product serves a special purpose and is therefore distinctive." (Reply Outline of Roberts Filter, p. 5) Roberts Filter later asserts that "[t]his is a case in which a unique product serves a specialized purpose, i.e., to replace support gravel in shallow filter beds where the engineer, without reconstructing the entire bed, seeks to increase the depth of the filter media." (Reply Outline of Roberts Filter, p. 6) This assertion is not supported by any competent evidence of record.

Leopold, on the other hand, argues with respect to the relevant market that Roberts Filter "has not identified any experts, economic or otherwise, to determine and testify as to the relevant market in this case ... There are no sales figures of record relating to the many other filter underdrain and support gravel suppliers in the United States and abroad ... [Furthermore,] counsel for both parties ... agreed, pursuant to Defendant's request, that Defendant need not produce their sales information as long as they returned Leopold's information and agreed not to use it in any form or for any purpose at trial." (Leopold's Brief in Support of Summary Judgment (Antitrust), p. 21–22) Leopold additionally argues, with respect to the market power analysis, that Roberts Filter "succeeded in having Leopold's patented design dropped from consideration by the City [of Reading] and achieving a position as the sole approved supplier ... [Roberts Filter's] ultimate position in the Reading specification is much more desirable than the original 'or equal' position of Leopold, since [Roberts Filter] had zero competition with the bidding contractors." (Leopold's Brief in Support of Summary Judgment, (Antitrust), p. 17, 18) Leopold concludes that "[i]t is inconceivable that [Leopold] can have the requisite market power in the relevant product and geographic market and yet, on the only two jobs highlighted by Roberts, Roberts won the first job and remains on an equal footing with [Leopold] on the second." (Leopold's Reply Brief, p. 11)

With respect to the various factors which should be considered in determining market power, Leopold argues that because Roberts

Filter was able to ultimately become the sole approved supplier for the City of Reading job, from which Leopold was completely eliminated from consideration, a high elasticity of consumer demand, strong competition in the market, and low barriers to entry have been displayed. (Leopold's Brief in Support of Summary Judgment (Antitrust) p. .18) Leopold also alleges that "there are several other water filtration technologies which Plaintiff and Defendant must compete with every day." Leopold states in its brief that "these alternatives include reverse osmosis, diatomaceous earth, slow sand filtration, nozzle bottoms, pressure filters, carriage filters and others." (Leopold's Brief in Support of Summary Judgment (Antitrust) p. 19) Roberts Filter challenges this statement for lack of supporting evidence.

 We begin by determining whether Roberts Filter has met its burden of defining the relevant markets. Counsel for Roberts Filter initially defined the relevant product market as "the sale of underdrain filter block and porous plate for new construction and porous plate for rehabilitation," and has defined the relevant geographic market as the United States. (Roberts Filter's Brief at 35) Leopold does not specifically challenge the definition of the relevant geographic market; however, Leopold does contest Roberts Filter's definition of the relevant product market. We find that Roberts Filter has failed to produce sufficient evidence to establish a relevant product market.

Initially, we would note that Leopold summed up the problems with Roberts Filter's relevant product market analysis aptly when it stated that "[e]ven upon reading Mr. Roberts' Affidavit, one still has no sense as to what exactly the relevant market is." (Leopold's Reply Brief, p. 6) Indeed, Mr. Roberts' affidavit speaks of several different markets including: (1) the market for porous plate/underdrain block systems in concrete structures producing 1 million gallons or more of water per day (¶ 5); (2) the market for factory supplied underdrain systems for water filtration systems (¶ 6); (3) the market for underdrain systems (¶ 7); (4) the market for filtration equipment (¶ 11); (5) the market for rehabilitation of the plastic Universal Underdrain (¶ 17); and (6) the market for rehabilitation (¶ 12). In its argument concerning tying, Roberts Filter states that "there existed in 1989 and continues to exist separate markets for tying purposes for both porous plate and plastic or ceramic underdrain block." (Roberts Filter's Brief, p. 62) Additionally, Roberts Filter's counsel has described the relevant market as "underdrain filter systems utilizing porous plate." (Reply Outline at 5)

To the extent that Roberts Filter attempts to define the relevant market in terms of the sale of underdrain filter block and porous plate for new construction and porous plate for rehabilitation, we find that this definition fails because Roberts Filter has not produced evidence or analyzed the product in terms of interchangeability.

Roberts Filter argues that "Leopold has offered *no evidence* from which one can conclude that the other filtration processes which it has identified are indeed 'interchangeable with the porous cap filtering system.'" (Roberts Filter's Reply Outline, p. 5) However, it is the burden of Roberts Filter to prove that the relevant market is "underdrain filter block and porous plate for new construction and porous plate for rehabilitation" and that other filtration alternatives "available for sale were not reasonably interchangeable." *Tunis Bros.*, 952 F.2d at 724 (internal quotations omitted).

The Supreme Court has stated that "[i]nterchangeability is largely gauged by the purchase of competing products for similar uses considering the price, characteristics and adaptability of the competing commodities." *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 380–81, 76 S.Ct. 994, 999, 100 L.Ed. 1264 (1956). "At a minimum, the product market must take into account the various types of [systems] which consumers would utilize as a substitute for the . . . product." *Pastore v. Bell Telephone Co. of Pennsylvania*, 1993 WL 664548 at *6 (W.D.Pa. Sept. 22, 1993). While Roberts Filter has summarily alleged that an underdrain filter system utilizing porous plate is unique and not reasonably interchangeable with any other identified product, Roberts Filter provides no evidence or analysis for

this assertion, nor has it analyzed the price, characteristics or adaptability of the competing commodities. Moreover, while the porous plate may indeed be unique or different from other products, it is clear that "where there are market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others." *Id.* at 394, 76 S.Ct. at 1006.

The fact that Leopold did not produce any evidence to the contrary is not essential. It is undisputed that the alternative underdrain/support gravel system was ultimately used by Roberts Filter for the Maiden Creek Filter Rehabilitation Project. Roberts Filter has not offered evidence which would tend to explain why this system was not viewed by the City of Reading "as a substitute for the [underdrain/porous plate] product." *Id.* Roberts Filter's assertion that "Roberts does not have to be satisfied with having to try and convince every engineer that they should use an entirely different kind of system which does not serve the specific purpose that the engineer originally specified," even if supported by competent evidence, does not explain why an underdrain/support gravel system is not viewed by the consumer as a substitute for the Leopold product.

Moreover, R. Lee Roberts' affidavit, itself, indicates reasonable interchangeability. Roberts states that "*one* of the methods available to rehabilitate an old filter bed and increase quality and production is to replace the 12 to 18″ of support gravel with something like a porous plate, thereby allowing for the use of more filter media." (Affidavit of R. Lee Roberts, ¶ 19) (emphasis added) Roberts further states that the porous plate "is a method of quality and production increase *which will interest* a number of engineers and consumers." (Affidavit of R. Lee Roberts, ¶ 19) (emphasis added) This indicates the availability of other systems.

The Third Circuit has stated that "a well-defined submarket may constitute a relevant product market and so under certain circumstances a relevant product market could consist of one brand of a product." *Tunis,* 952 F.2d at 723. However, the determination that a submarket constitutes a relevant product market includes examining "such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Tunis,* 952 F.2d at 723, citing *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962). Roberts Filter has not set forth evidence sufficient to conduct such an examination.

We recognize that generally "the determination of a relevant product market or submarket ... is a highly factual one best allocated to the trier of fact." *Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 199 (3d Cir.1992). However, Leopold has demonstrated that Roberts Filter has failed to produce evidence sufficient to establish the existence of an element essential to Roberts Filter's case, and on which Roberts Filter will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Since the traditional summary judgment standard applies with equal force in antitrust cases, *Alvord–Polk, Inc. v. F. Schumacher & Co.,* 37 F.3d 996, 1001 (3d Cir.1994), we find that summary judgment is appropriate because Roberts Filter has failed to offer sufficient evidence from which a reasonable jury might find that the universal underdrain/porous plate constitutes the relevant product market.

With respect to any broader definition, Roberts Filter has come forward with no evidence which would indicate how a broader market could be defined.

Although Roberts Filter has not defined a relevant product market, we nevertheless address the question of whether Roberts Filter has come forward with sufficient, competent evidence to establish that Leopold has sufficient market power to come dangerously close to success within the market. Leopold argues that even if a relevant market were found to exist, that market power has not been established. We agree.

In *M & M Medical Supplies v. Pleasant Valley Hosp.,* 981 F.2d 160, 166 (4th Cir.

1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2962, 125 L.Ed.2d 662 (1993), Plaintiff filed suit alleging six separate antitrust claims which included a claim for attempted monopolization under section 2 of the Sherman Act. *See M & M Medical Supplies v. Pleasant Valley Hosp.,* 738 F.Supp. 1017, 1018 (S.D.W.Va.1990). The district court granted the defendant's motion for summary judgment finding, *inter alia,* that the plaintiff failed to establish that the defendant had monopoly power in the relevant product and geographic markets. In reaching its decision, the district court found that the affidavit of the plaintiff's economic expert had "set forth no facts to support these opinions," and had provided "no specific examples" of the defendant's anticompetitive conduct. *Id.* 738 F.Supp. at 1020. The Fourth Circuit, en banc, reversed the district court's holding and found that the affidavit of the plaintiff's economic expert "was far more than a conclusory statement based on general antitrust theory." *Pleasant Valley,* 981 F.2d at 164. Rather, the court found that what was omitted from the affidavit was not facts or reasons, but rather the underlying data supporting the facts. *Id.,* 981 F.2d at 164–65. The Fourth Circuit found that the lack of underlying data supporting an affiant's assertion of fact does not mandate exclusion of the affidavit under Fed.R.Civ.P. 56, so long as the affidavit is not wholly conclusory and devoid of reasoning. *Id.* 981 F.2d at 165.

We find *Pleasant Valley* persuasive in the case at bar. Under the rationale of *Pleasant Valley,* while the underlying data supporting an affiant's assertion need not be submitted with the affidavit, an expert's *conclusory* affidavit lacking facts or reasons does not satisfy the requirements of Fed.R.Civ.P. 56(e). That is exactly the situation presented by the Affidavit of R. Lee Roberts and the deposition testimony of Marvin Brown in the case at bar.

Specifically, although R. Lee Roberts states that "Leopold clearly has the dominant market share (approximately 80 percent in the past two or three years) for underdrain systems," and that "[i]n the market for porous plate/underdrain block systems ... Leopold has 100%," Roberts provides no facts or reasons for reaching this conclusion. (Affidavit of R. Lee Roberts, ¶ 7) Roberts goes on to state that "[a]t an average cost of $120–$150 per square foot, the total yearly market for filtration equipment will be between $25,000,000 to $30,000,000. *I estimate that approximately one-half of that will involve rehabilitation. About one-half will involve the separate market in porous plate systems.*" (Affidavit of R. Lee Roberts, ¶ 19) Once again, no facts or reasons are given for these "estimates." Such conclusory statements are insufficient to establish market share. *See Pleasant Valley,* 981 F.2d at 164–65.

The deposition testimony of Marvin Brown is similarly defective. First of all, it is not clear to what market share Mr. Brown is referring. For example, Mr. Brown first states that Leopold "probably [has] something like 75 percent," of the market share in filtration installations. (Deposition of Marvin Brown, *supra*) Then Mr. Brown goes on to state that it was probably the underdrains and related equipment in a filter that he was referring to. To further obfuscate the issue, Mr. Brown files an addendum to his testimony wherein he states that the 75% referenced his "estimate of the number of jobs awarded to Leopold out of total jobs bid." (Leopold's Exhibits as to Defendant's Antitrust Counterclaim, Exhibit 29, p. 3) Secondly, Mr. Brown at no time states any facts or reasons in support of his "estimate." This testimony is insufficient to establish market power. For the same reason, the letters written by Brown wherein Brown claims that Leopold is the undisputed market share leader are insufficient to establish market share in a relevant market.

▪ While it appears as though many parties in antitrust cases utilize expert testimony in order to establish relevant market and market power, we have found no authority which indicates that expert testimony is required, and we do not venture to so hold. *See e.g. Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 894 (10th Cir.1991) (While finding that the plaintiff failed to present sufficient evidence of dangerous probability that the defendant could achieve monopoly status in the relevant market, the court stat-

ed that the testimony of former employee of the defendant, an employee of the plaintiff, and the president of the plaintiff company sufficient to support claim that defendant held a significant market share.)

■ Something more than conclusory allegations, however, must be presented in order to withstand summary judgment. While Roberts Filter, in attempting to demonstrate the nature of Leopold's alleged anti-competitive conduct, may very well have set forth a sound basis for its inequitable conduct theory in the patent infringement count (see Roberts Filter's Supplemental Memorandum in Opposition to Summary Judgment on the Antitrust Counterclaims), we find that such alleged anti-competitive conduct, in and of itself, is insufficient to establish an antitrust cause of action. *See Spectrum Sports,* — U.S. at —, 113 S.Ct. at 892 ("The concern that § 2 might be applied so as to further anticompetitive ends is plainly not met by inquiring only whether the defendant has engaged in 'unfair' or 'predatory' tactics.").

■ Roberts Filter has established neither a relevant market nor the market power of Leopold. Summary judgment must therefore be granted as to Roberts Filter's antitrust claims under section 2 of the Sherman Act, and *Walker Process.*[10]

■ Finally, we address Roberts Filter's tying claim. Quite clearly put, "[t]ying exists when a seller of product A requires his purchasers to take product B as well." R. Bork Antitrust Paradox at 365 (1993). *See also Allen–Myland, Inc. v. International Business Machines Corp.,* 33 F.3d 194, 200 (3d Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 684, 130 L.Ed.2d 615 (1994). A tying arrangement violates section 1 of the Sherman Act if "the seller has 'appreciable economic power' in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 462, 112 S.Ct. 2072,

2079, 119 L.Ed.2d 265 (1992) (internal quotations omitted).

Initially, a court in a section 1 tying case must determine whether "the defendant has sufficient market power over the tying product, which requires a finding that two separate product markets exist and a determination of precisely what the tying and tied product markets are." *Allen–Myland,* 33 F.3d at 200–201. In discussing the policy concerns behind finding tying arrangements violative of section 1 of the Sherman Act, the Third Circuit has stated that:

> The antitrust concern over tying arrangements is limited to those situations in which the seller can exploit its power in the market for the tying product to force buyers to purchase the tied product when they otherwise would not, thereby restraining competition in the tied product market.

*Id.* at 200.

Roberts Filter defines the unlawful tying arrangement in this case as "Plaintiff's market control is such that it can require customers to purchase both underdrain block and porous plate cap from plaintiff when there are or may be separate markets for each of such products." (Roberts Filter's Brief at 57, citing Amended Answer and Counterclaim) Roberts Filter does not, however, specify which is the tying and which is the tied product. At one point in its brief, Roberts Filter states that "[t]he tying product is not necessarily the underdrain block, because, as Plaintiff notes in its Brief, the patent on the Universal Underdrain expires in December, 1994." (Roberts Filter's Brief at 62) Leopold assumes in its brief that the tying product is the underdrain block. (Leopold's Brief in Support of Summary Judgment (Antitrust) p. 22–23)

We find that if tying exists, then the arguments of Roberts Filter most logically point to the porous plate as being the tying product. Roberts Filter has not argued that when one purchases a Universal Underdrain,

---

**10.** If all of the prerequisites to a section 2 claim are shown, then a patent owner can be liable for enforcement of a patent known to be procured by fraud. *Walker Process Equip. Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 174, 86 S.Ct. 347, 349, 15 L.Ed.2d 247 (1965). Since we have determined that Roberts Filter has failed to allege facts sufficient to withstand summary judgment on the section 2 claim, the *Walker Process* claim must necessarily be dismissed.

that one must necessarily purchase a porous plate. Rather, Roberts Filter argues that if one purchases a porous plate, that one must necessarily purchase a Universal Underdrain in order to avoid infringing Leopold's patent. (See Roberts Filter's Brief, p. 60–61, quoting Mr. Brown's assertion that "it's very difficult to imagine *any* design where you affix a porous plate to the top of a lateral underdrain without infringing.") Indeed, underdrain blocks, such as Leopold's Universal Underdrain [11] have been conventionally used in conjunction with support gravel, rather than porous plates. (See Leopold's Brief in Support of Summary Judgment (Antitrust), p. 3; see also Roberts Filter's Brief, p. 7–8) In fact, counsel for Roberts Filter represented to the Court at oral argument that support gravel was used by Roberts Filter for the Maiden Creek Filter Rehabilitation project.

Having determined that the porous plate is the tying product, we next must determine whether Roberts Filter has demonstrated that Leopold has "appreciable economic power in the tying market." *Eastman Kodak,* 504 U.S. at 464, 112 S.Ct. at 2080. Interestingly, the porous plate, itself, is patented. The patent, which was issued on November 21, 1989, is held by Joseph Ferri, the owner of General Polymerics, the company that manufactures the Leopold porous cap. (See Volume I of Roberts Filter's Exhibits, Exhibit 11) Polymerics sells this plate to other companies for use in water filtration systems. (See e.g. Volume I of Roberts Filter's Exhibits, Exhibit 101, p. 57–59) According to Roberts Filter, Porex Technologies, Inc. of Fairburn Georgia also manufactures a porous plate. (Roberts Filter's Brief at 9) Roberts Filter has not come forward with evidence which would tend to indicate that Leopold has market power in the porous plate market.

We recognize the problems faced by Roberts Filter in attempting to use porous plate technology. (See, e.g. Roberts Filter's Brief, p. 62, 63 "[I]f one wants to rehabilitate a system in which Leopold Universal under-

drain block had been installed, one should be able to buy the porous plate from General Polymerics because General Polymerics may be willing to sell it cheaper than Leopold," and "if one wants to purchase porous plate and use it with an underdrain manufactured by a company other than Leopold, the '427 patent will be infringed, according to Brown.") However, those problems do not excuse Roberts Filter from coming forward with sufficient evidence to establish all the elements of its illegal tying claim.

Accordingly, we find that Roberts Filter has failed to establish all the elements of an illegal tying arrangement. Summary judgment on this claim will be granted.

Finally, Leopold asks this Court to exclude Roberts Filter from putting forth any evidence concerning its Fourth, Sixth, Seventh, Twelfth and Sixteenth Affirmative Defenses at trial. This argument can more appropriately be addressed as a motion *in limine.*

### ORDER OF COURT

**AND NOW,** this 10th day of March, 1995, pursuant to the Opinion attached hereto, and for the reasons set forth in the Opinion accompanying this Order, it is hereby **ORDERED** that the Motion for Summary Judgment (Doc. 159) filed by The F.B. Leopold Company with regard to the Counter–Claim filed by Roberts Filter concerning defamation is **GRANTED** in part and **DENIED** in part.

It is further **ORDERED** that the Motion for Summary Judgment (Doc. 156) filed by the F.B. Leopold Company with regard to the Counter–Claim filed by Roberts Filter concerning anti-trust claims is **GRANTED** as to all the anti-trust claims.

It is further **ORDERED** that a Pre–Trial Conference will be held on Friday, April 21, 1995 at 9:00 A.M. at which time counsel *must* appear with authority to settle from their clients.

11. The Universal Underdrain was originally patented in 1977. The patent expired in December, 1994.